REVISED, July 23, 1998

**UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT**

_____

No. 97-20252
_____


AMWEST SAVINGS ASSOCIATION, a Texas state savings and loan
association, and HSA MORTGAGE COMPANY,

Plaintiffs-Appellants,


VERSUS


STATEWIDE CAPITAL, INC., GAYLE SCHRODER, CLAY STONE,
MELVIN POWERS, JOE LONG, and GORDON BEYERLEIN,

Defendants-Appellees.


_____

Appeal from the United States District Court
For the Southern District of Texas
_____
July 10, 1998

Before POLITZ, Chief Judge, and DAVIS and DUHÉ, Circuit Judges.

W. EUGENE DAVIS, Circuit Judge:

Appellants Amwest Savings Association ("Amwest") and HSA
Mortgage Company ("HSA") appeal from the district court's "take
nothing" judgment against them.  For the reasons set out below, we
affirm the judgment of the district court.

I.

In 1988, Amwest entered into an agreement to purchase the
assets of eleven failed savings and loan associations from the

Federal Savings and Loan Insurance Corporation ("FSLIC").[1] At that time, as a result of the failure of numerous savings and loans, FSLIC's insurance fund contained insufficient monies to cover insured deposits. In order to generate revenue, the Federal Home Loan Bank Board took over the portfolios of insolvent savings and loans associations and sold those portfolios to larger savings and loan associations such as Amwest.

In connection with Amwest's purchase of the assets of the failed savings and loans, Amwest and FSLIC entered into an "Assistance Agreement."[2] Under the Assistance Agreement, Amwest was to liquidate unprofitable assets and manage profitable assets, sharing revenues with the FDIC. Amwest was also guaranteed to recover the book value of certain "covered" assets upon the sale of such assets. Thus, if Amwest sold a "covered" asset for less than its book value, the FDIC would pay Amwest the difference between the asset's purchase price and its book value. If Amwest sold a "covered" asset for more than its book value, Amwest would split the profit with the FDIC under a formula set out in the Assistance Agreement.

BancHome was one of the insolvent institutions whose assets were purchased by Amwest. HSA, A-1, Inc., and A-1 Mobile Homes,

---

[1] The assets were actually purchased by NuOlney Savings, which later changed its name to Amwest.

[2] FSLIC was dissolved by the Financial Institutions Reform, Recovery, and Enforcement Act ("FIRREA") which was passed in August 1989. The Federal Deposit Insurance Corporation ("FDIC") succeeded FSLIC as a party to the Assistance Agreement after FIRREA was passed. For simplicity, this opinion will hereinafter refer to the federal regulator involved as the FDIC.

2

Inc. (collectively, the "Mobile Home Subsidiaries") were wholly-owned subsidiaries of BancHome and were among BancHome's assets that were purchased by Amwest. The mobile home assets of the Mobile Home Subsidiaries were determined to have a book value of $250 million.

Amwest hired defendant Clay Stone to manage the Mobile Home Subsidiaries. Between October 1988 and December 1989, Stone operated the Mobile Home Subsidiaries at a loss. Amwest decided to liquidate the assets of the Mobile Home Subsidiaries, and the FDIC approved its decision. In December 1989, Amwest began taking bids on the mobile home assets, eventually accepting the bid of defendant Statewide Capital, Inc. ("Statewide").

The parties agreed that there would be more than one closing due to the complexity of the transaction. The first closing took place on June 12, 1990. On that date, the parties signed an asset purchase agreement. The second closing took place on August 31, 1990. At this closing, a dispute arose concerning $14 million in loans in HSA's portfolio that HSA sold in mid-August without Statewide's knowledge. Statewide claimed that under the asset purchase agreement Statewide was to purchase all of the loans in HSA's portfolio and demanded a "credit" towards the purchase price of the remaining loans in the portfolio as some share of the profit from the sale of the loans. The dispute was resolved when Amwest offered Statewide a final closing price of $71,239,094 on the remaining loans, which reflected a $5.6 million credit towards the original purchase price of those loans. Statewide accepted

3

Amwest's offer and wired the funds to close the deal. Later, Amwest discovered that it had made a $2,852,722 math error in calculating the amount of the credit, and had thereby inadvertently issued Statewide a $2.8 million "double" credit. Amwest demanded immediate repayment of $2.8 million, but Statewide refused to comply. The final closing occurred on September 30, 1990.

On December 19, 1990, Amwest and HSA (collectively, "Amwest") filed suit against Statewide, Stone, Gordon Beyerlein, then-general counsel of HSA, and three principals of Statewide -- Gayle Schroder, Melvin Powers, and Joe Long, alleging that they had conspired to manipulate the bidding process in Statewide's favor and to ensure that Statewide would obtain the mobile home assets at less than fair market value. Amwest also alleged that Stone had engaged in expense account abuse by obtaining reimbursement for personal expenses. In addition, Amwest sought recovery from Statewide of the $2.8 million "double" credit.

Prior to the submission of the case to the jury, the court granted judgment as a matter of law in favor of Statewide on Amwest's claim for the recovery of the $2.8 million "double" credit and in favor of Stone on Amwest's expense account abuse claim. On July 6, 1995, after a five-week trial, the jury found in favor of Amwest on each of its claims. Specifically, the jury found that Stone and Beyerlein had made several misrepresentations, including misrepresentations concerning the fair market value of the mobile home assets, and that Stone and Beyerlein had breached their respective fiduciary duties to Amwest and HSA. The jury also found

that Stone, Beyerlein and the other defendants had conspired to varying degrees to commit fraud and breach of fiduciary duty. Finally, the jury found that Statewide had breached the asset purchase agreement in a number of respects. The upshot of defendants' collective wrongdoing was to effectively lower the purchase price of the mobile home assets, thereby increasing the amount that the FDIC paid Amwest to make up the difference between the book value of the assets and the amount that Amwest received for them.

The jury awarded Amwest approximately $22 million in compensatory damages and $16.5 million in punitive damages. Defendants subsequently filed renewed motions for judgment as a matter of law, or, in the alternative, for a new trial. On April 2, 1996, the district court granted defendants' renewed motions for judgment as a matter of law on the ground that Amwest had not suffered any damages because it had been fully compensated by the FDIC for the losses it sustained as a result of defendants' conduct. Nearly a year later, the district court conditionally granted defendants' motions for a new trial on grounds that Amwest had engaged in pre-trial misconduct and that certain jury instructions were fatally defective. On February 25, 1997, the court entered a "take nothing" judgment against Amwest.

On appeal, Amwest argues that the district court erred in granting defendants' renewed motions for judgment as a matter of law and in conditionally granting defendants' motions for a new trial. Amwest also argues that the district court erred in

5

granting Statewide's motion for judgment as a matter of law on Amwest's claim for recovery of the $2.8 million "double" credit and on Stone's motion for judgment as a matter of law on Amwest's expense account abuse claim.

## II.

The district court granted defendants' renewed motions for judgment as a matter of law in favor of defendants on the ground that Amwest had not suffered any damages. We agree that Amwest failed to show that it suffered any damages as a result of defendants' wrongdoing with respect to the purchase price of the mobile home assets.[3] The book value of the mobile home assets was $250 million dollars. Although Amwest received less from Statewide than it would have if not for defendants' wrongdoing, the FDIC fully compensated Amwest for its loss when it made up the difference between the purchase price of the assets and their book value.[4]. The district court noted that [5]

On appeal, Amwest presents several theories under which it contends it is entitled to the damages awarded by the jury.

First, Amwest argues that it was obligated under the Assistance Agreement to pursue claims that would minimize losses to

---

[3]    We recognize that defendants maintain that the evidence is insufficient to support the jury's verdict.

[4]    The district court noted that Amwest received

approximately $108 million from Statewide and that the FDIC paid Amwest approximately $142 million. At oral argument, the parties stated that Amwest in effect received approximately $115 million from Statewide. In any event, the FDIC made up the difference between the amount Amwest received for the assets and their book value.

the FDIC. Although Amwest elicited testimony from an FDIC officer that Amwest was obligated under the Assistance Agreement to pursue the type of claims at issue here and tender any recovery to the FDIC, Amwest fails to cite any provision in this 113-page document that authorizes Amwest to pursue such claims. Section 7(b) of the Agreement requires Amwest to pursue "Related Claims" and provides that sums recovered from such claims shall be credited to Special Reserve Account I, an account established to effect the provisions of the Assistance Agreement. "Related Claims" are defined as those claims which may result in a recovery by Amwest and which are related to claims for which the FDIC is obligated to indemnify Amwest under § 7 of the Agreement. Pursuant to § 7 of the Agreement, the FDIC is required to indemnify Amwest for only two types of claims: 1) those "based upon a liability, contract or action or failure to act or a status or capacity of any ACQUIRED ASSOCIATION . . . which is asserted against [Amwest]"; and 2) certain actions brought by a party other than Amwest to challenge or set aside a transaction or the Agreement. Amwest's "purchase price" claims are not related to either of these two types of claims.

Second, Amwest argues that the FDIC ratified this lawsuit in a July 12, 1991 letter agreement prior to Amwest's final submission for reimbursement in February 1992. The July 12, 1991 letter agreement apparently provides for the parties to share in any recovery from this action. Even if the FDIC "ratified" this lawsuit by entering into such an agreement, however, its

7

ratification is meaningless. The fact remains that the FDIC fully and unconditionally reimbursed Amwest prior to trial and that Amwest therefore was unable to show damages as to its "purchase price" claims. Thus, any agreement between the parties as to any recovery on such claims is of no consequence because Amwest had no damages to recover.

Third, Amwest argues that it is entitled to the damages awarded by the jury under the collateral source rule. Under Texas law, medical insurance, disability insurance, and other forms of protection purchased by a plaintiff, as well as gifts received by a plaintiff, are easily identifiable as independent sources subject to the collateral source rule. *See Lee-Wright, Inc. v. Hall*, 903 S.W.2d 868, 874 (Tex. Ct. App. 1992). The Restatement (Second) of Torts also identifies insurance policies, employment benefits, gratuities, and social legislation benefits as types of benefits as to which the collateral source rule applies. *See* Restatement (Second) of Torts § 920A cmt. c. The rationale underlying the collateral source rule is that a plaintiff should not be forced to transfer to a wrongdoer a benefit that the plaintiff has received either as a gift or as a result of foresight and planning, as by purchasing insurance or bargaining for employment benefits. *See id.* cmt. b.

Amwest has not cited and we are not aware of any controlling authority that has expanded the collateral source rule to cover sources other than those enumerated above. Amwest argues, however, that the Assistance Agreement is analogous to an insurance policy

8

in that it provided protection against the risk that Amwest would recover less than the book value of the "covered" assets. Although this argument has some superficial appeal, we are not persuaded. The FDIC indeed guaranteed Amwest the book value of "covered" assets upon the sale of such assets; however, the FDIC was also entitled to split the profit if Amwest sold a "covered" asset for greater than book value. Amwest points to no evidence that the consideration for the FDIC's guarantee was some portion of the price that Amwest paid for the "covered" assets rather than the FDIC's right to participate in any profits realized from Amwest's sale of such assets. Because Amwest has not shown that it paid a "premium" for the FDIC's guarantee, its insurance policy analogy fails. Accordingly, we conclude that the FDIC's reimbursement under the Assistance Agreement is not a collateral source within the meaning of the collateral source rule.

Fourth, Amwest argues that it is entitled to the damages awarded under the doctrine of subrogation. Amwest contends that upon reimbursement the FDIC became subrogated to Amwest's "purchase price" claims and that the FDIC authorized Amwest to pursue those claims on its behalf. Even if Amwest were correct that the FDIC became subrogated to its claims, however, Amwest does not cite any provision in the Assistance Agreement that authorizes Amwest to pursue any of the FDIC's claims on its behalf. And contrary to Amwest's assertion, there is nothing in the July 12, 1991 letter agreement that provides such authorization.

Finally, Amwest argues that it is entitled to the damages

9

awarded under *FSLIC v. Reeves*, 816 F.2d 130 (4th Cir. 1987). In *Reeves,* FSLIC entered into an agreement with a savings and loan association, Metropolitan, to indemnify Metropolitan for all losses attributable to a merger that FSLIC facilitated between Metropolitan and another savings and loan association, County Federal. In exchange, Metropolitan agreed to assign, upon request, certain claims of County Federal, and to credit to a special reserve account any recovery on such claims. After obtaining such an assignment, FSLIC filed suit against the former officers and directors of County Federal. The defendants argued that FSLIC lacked standing to pursue the claims against them because Metropolitan had not suffered any injury and thus had no cause of action for losses suffered by County Federal prior to the merger.

The court held that FSLIC could pursue the claims at issue because the only reason Metropolitan had not suffered any injury was that FSLIC had agreed to indemnify Metropolitan in exchange for an assignment of the claims at issue. As the court recognized that Metropolitan had not suffered any injury, however, *Reeves* provides no basis for upholding the jury's damages award in favor of Amwest.

Amwest recites a litany of horrors that will ensue if the district court's judgment in favor of defendants is allowed to stand. We do not agree that affirming the judgment of the district court will, as Amwest claims, "undermine the interests of taxpaying citizens," "reward wrongdoers in every case in which the FDIC entered into an assistance agreement," or allow "tortfeasors against failed banks or their successors . . . [to] wreak havoc

10

upon these institutions without any fear of legal reprisal."  The FDIC could have sought subrogation of Amwest's claims or sought an assignment of such claims to recoup the losses caused by defendants.  For reasons best known to the FDIC, it chose not to do so.

Having concluded that Amwest did not show that it suffered any damages and having disposed of Amwest's arguments that it is entitled to the damages awarded by the jury,[6] we affirm the district court's judgment in favor of defendants on Amwest's "purchase price" claims.

III.

Prior to the submission of the case to the jury, the district court granted judgment as a matter of law in favor of Statewide on Amwest's claim for the recovery of the $2.8 million "double" credit it inadvertently issued to Statewide in resolution of the dispute between the parties concerning Statewide's purchase of the loans in HSA's portfolio.[7]  The court held that because Statewide was not involved in the calculation of the credit, Amwest's math error was a "unilateral mistake" which did not entitle Amwest to relief.

As the district court recognized, a unilateral mistake is not a ground for reformation of an agreement.  *See RGS, Cardox Recovery, Inc. v. Dorchester Enhanced Recovery Co.*, 700 S.W.2d 635,

---

[6] Under Texas law, which applies in this case, punitive damages are not recoverable absent recovery of compensatory damages. *See Federal Express Corp. v. Dutschmann*, 846 S.W.2d 282, 284 (Tex. 1993).

[7] Apparently, Amwest was not reimbursed by the FDIC for the $2.8 million "double" credit.

11

640 (Tex. Ct. App. 1985). Amwest does not attempt to challenge the district court's conclusion that it committed a unilateral mistake. Rather, it argues, correctly, that a unilateral mistake accompanied by fraud by the other party will warrant reformation. *See id.*

The jury found that Stone fraudulently induced Amwest to issue a $2.8 million credit and that Statewide conspired with Stone to fraudulently induce Amwest to do so. Amwest's $2.8 million math error was made in connection with the issuance of that credit.

Statewide contends that there is no evidence to support the jury's finding that Stone fraudulently induced Amwest to issue the credit. In its April 2, 1996 ruling, the district court indicated that it tended to agree. Although Amwest alleges that Stone misrepresented that Statewide was entitled to the credit, Amwest does not point to any evidence that shows that Statewide was not entitled to the credit as some share of the profit from the sale of the $14 million in loans in HSA's portfolio that HSA sold without Statewide's knowledge and that Statewide believed it had contracted to purchase. Accordingly, we conclude that Amwest is not entitled to relief from its unilateral mistake on the ground that it was accompanied by fraud.

Amwest's reliance on *Community Mutual Ins. Co. v. Owen*, 804 S.W.2d 602 (Tex. Ct. App. 1991) to otherwise support its position that it is entitled to recover the "double" credit is misplaced. In *Owen,* an insurance company issued payment for an insured's hospital expenses to both the insured and the hospital. The insured deposited the payment issued to him into his bank account

12

and did not pay the hospital. The court held that the insurance company was entitled to recovery of the payment to the insured because the insurance company had made the payment under a mistake of fact and the insured had not materially changed his position in reliance on the payment. *Id.* at 605.

Unlike the double payment in *Owen*, the double credit in this case was made pursuant to an agreement between the parties in resolution of a dispute. The parties disagreed not only as to whether Statewide was entitled to a credit, but also as to certain other issues that would affect the amount of the credit. Amwest eventually relented and agreed to issue Statewide a credit. Statewide points to evidence that, after Amwest agreed to give Statewide a credit, Amwest calculated the amount of the credit and offered Statewide a closing price based on that credit. Statewide accepted Amwest's offer and wired the funds to close the deal. Amwest, on the other hand, does not point to any evidence that the parties agreed on the methodology for calculating the credit. As Statewide played no part in the calculation of the credit and closed the deal once Amwest offered a closing price based on the credit, it cannot be said that, like the insured in *Owen*, Statewide did not materially change its position in reliance on the credit. Accordingly, we affirm the district court's judgment in favor of Statewide.

IV.

The district court also granted Stone's motion for judgment as a matter of law on Amwest's claim that Stone breached his fiduciary

13

duty to HSA by using his expense account to obtain reimbursement for personal expenses from HSA funds.[8]  Amwest argues that in ruling in favor of Stone, the district court erroneously shifted the burden of proof to Amwest.  According to Amwest, when a fiduciary relationship exists between parties, equity requires that the fiduciary establish the fairness of a transaction with the principal.  Amwest contends that because Stone failed to discharge this burden, the district court should have ruled in its favor.

Amwest relies on two Texas cases in support of its argument. In *Texas Bank and Trust Co. v. Moore*, 595 S.W.2d 502 (Tex. 1980), the nephew of an elderly woman caused her to transfer certain property to him before her death.  The court concluded that the nephew was the aunt's fiduciary and, as a result, a presumption arose that any gift from the aunt, the principal, to the nephew, the fiduciary, was unfair and invalid.  *Id.* at 506.

In *Archer v. Griffith*, 390 S.W.2d 735 (Tex. 1964), an attorney obtained a deed to real property from his client as compensation for representing her in a divorce case.  The court held that because of the fiduciary nature of the attorney-client relationship in existence at the time of the conveyance, a presumption of unfairness or invalidity attached to the transaction.  *Id.* at 739.

We do not agree that *Moore* and *Archer* support Amwest's contention that Stone bore the burden of proof on Amwest's expense

---

[8]     The court orally granted Stone's motion on July 3, 1995 during a charging conference.  Although the court stated that it would issue a written opinion on the motion, none was forthcoming.

14

account abuse claim.  Both cases held that fiduciaries who engaged in "transactions" with their principals were required to prove the fairness of those transactions.  Neither suggests that anytime a fiduciary is accused of wrongdoing he or she bears the burden of proving otherwise.  Stone's alleged reimbursement of personal expenses was a misappropriation of corporate funds, not a "transaction" in which he engaged with HSA.  Accordingly, Amwest bore the burden of proof on its expense account abuse claim.  *See Lemons v. Davis*, 306 S.W.2d 224, 227 (Tex. Ct. App. 1957) (holding that principal bore burden of establishing fiduciary's misuse or waste of funds).  We therefore affirm the district court's ruling in favor of Stone.

V.

For the reasons set out above, the judgment of the district court is AFFIRMED.

15