25 A.3d 988

**MILLIMAN, INC.**

v.

**MARYLAND STATE RETIREMENT
AND PENSION SYSTEM, et al.**

No. 102, Sept. Term, 2010.

Court of Appeals of Maryland.

July 20, 2011.

Robert J. Mathias (Kurt J. Fischer, Jennifer M. Skaggs, and William L. Reynolds of DLA Piper US LLP, Baltimore, MD; Stephen T. Jacobs and Sarah A. Huck of Reinhart Boerner Van Deuren S.C., Milwaukee, Wisconsin), on brief, for Appellant/Cross–Appellee.

Dana A. Reed, Asst. Atty. Gen. (Douglas F. Gansler, Atty. Gen. of Maryland, and Kathleen E. Wherthey, Asst. Atty. Gen., Baltimore, MD; Rachel S. Cohen, Asst. Atty. Gen., Baltimore, MD), on brief, for Appellees/Cross–Appellants.

Argued before BELL, C.J., HARRELL, BATTAGLIA, GREENE, MURPHY, ADKINS, BARBERA, JJ.

**BATTAGLIA, J.**

In this case, we are tasked with reviewing a decision of the State Board of Contract Appeals, which determined that Milliman, Inc., Appellant, ("Milliman"), had breached contracts to provide actuarial services[1] to the Maryland State Retirement System, Appellee, ("the System"), allegedly resulting in approximately $73 million in losses to the System as a result of a claim that the System had filed against Milliman pursuant to Section 15-219.1 of the State Finance and Procurement Article, Maryland Code (2001, 2006 Repl.Vol.);[2] the claim assert-

---

**1.** An "actuary" is a "statistician who determines the present effects of future contingent events; esp[ecially] one who calculates insurance and pension rates on the basis of empirically based tables." Black's Law Dictionary 41 (9th ed. 2009). *See also* William D. Hager and Paul-Noel Chretien, *The Emerging Law of Actuarial Malpractice,* 31 Drake L.Rev. 831, 831–32 (1981–1982) ("Using mathematical skills to define, analyze and solve complex business and social problems, the actuary designs insurance and pension programs and is responsible for their financial soundness. These programs create long-term financial obligations of often enormous magnitude dependent on the actuary's forecasts of probabilities and economic developments.")

**2.** Section 15–219.1 of the State Finance and Procurement Article, Maryland Code (2001, 2006 Repl.Vol.), provides the procedure of a contract claim against a contractor, as follows:

(a) *Written notice; contents; procedure upon receipt of claims.*
—(1) A unit may assert a contract claim against a contractor by sending written notice to the contractor and the procurement officer that states:
(i) the basis for the contract claim;
(ii) to the extent known, the amount, or the performance or other action, requested by the unit in the contract claim; and
(iii) the date by which the contractor is required to provide a written response to the contract claim.
(2) On receipt of a contract claim from a unit, a procurement officer:
(i) shall review the substance of the contract claim;
(ii) may request additional information or substantiation through an appropriate procedure; and
(iii) may discuss or, if appropriate, negotiate the contract claim with the unit or contractor.
(3) The procurement officer shall proceed under subsection (b) of this section if the contractor fails to respond, provides an inadequate response, or denies the contract claim or the relief sought by the unit in whole or in part.
(b) *Proposed decision upon claim when no resolution is reached.*—(1) If the contractor and the unit do not resolve the contract claim, the

ed that Milliman had understated the contributions required to fund three of the State's ten retirement and pension systems because of the actuary's misinterpretation of a particular data code.

In the initial round of the administrative action, the Retirement System Procurement Officer determined that Milliman had "failed to comply with its contractual duties and responsibilities," and that the System was entitled to recover "$34.2 million in contributions that would have been received but for Milliman's errors, and $38.8 million in lost income that would have been earned on those contributions." Thereafter, Milliman appealed to the State Board of Contract Appeals, which heard the claim de novo and determined that in failing to detect and correct the coding error for a period of twenty two years, the actuary had substantially breached its contracts with the System, causing the three affected retirement funds to be significantly underfunded, amounting to $34,208,960 in lost contributions and $38,756,188 in lost interest on those contributions.

Milliman filed a petition for judicial review in the Circuit Court for Baltimore City, which affirmed the Board's findings that Milliman had breached its contracts with the System and affirmed the award of lost investment earnings, but reversed the Board's award of amounts equaling lost contributions. We granted certiorari prior to any proceedings in the intermediate appellate court to consider the following questions:

1. Can an actuarial funding recommendation for a state pension system, even one that contains an error, cause damages when it is undisputed that the funding recommendation resulted in contributions being received by the pen-

---

procurement officer shall prepare a proposed decision on the contract claim, including:

(i) a description of the contract claim;
(ii) references to pertinent contract provisions;
(iii) a statement of factual areas of agreement or disagreement; and
(iv) a statement in the proposed decision wholly or partly granting or denying the relief sought, with supporting rationale.

sion system that always met or exceeded statutory funding goals?

2. In determining the measure of damages, what is the legal relationship between the State of Maryland (the "State") and the Maryland State Retirement and Pension System (the "System"): are they separate, so that future contributions and earnings made by the State to the System must be considered in assessing damages to the System, or are they related so that any loss to the System must be offset by the gain retained by the State?

3. When applying the contributory negligence doctrine, must a trier of fact consider only expert testimony, or should factual evidence showing that the plaintiff contributed to the harm be considered and evaluated under a reasonable person standard?

The State Retirement and Pension System presented a conditional cross-petition, which we also granted, in which one question was posed:

Did the MSBCA [Maryland State Board of Contract Appeals] correctly assess damages, and did the circuit court erroneously reduce the MSBCA's damage award by $34,200,000 by employing an incorrect standard of review and adopting a theory that departs from well-established principles of Maryland law to find that the State of Maryland must pay the contribution portion of the damages caused by Milliman's breach, even if doing so would require the State to pay far more in contributions than it would have had to pay if Milliman had not breached its contracts?

*Milliman, Inc. v. Maryland State Retirement and Pension System*, 417 Md. 125, 9 A.3d 1 (2010). We shall hold that Milliman is liable to the System for repeatedly misinterpreting a data code associated with survivors' benefits, irrespective of whether the System met funding goals during the contracts. We shall further hold that because the State was not a party before the Board of Contract Appeals, whether the measure of damages should reflect the State's use and benefit of contributions not made to the System as a result of Milliman's errors

is not properly before us. In addition, we shall hold that the System was not negligent in the development or transmission of data provided to Milliman and, therefore, contributory negligence does not bar the System's recovery. Finally, we shall hold that the Circuit Court erroneously reduced the Board's damage award by $34,200,000, representing lost contributions, and therefore, shall vacate the judgment of the Circuit Court and shall direct that the Board's decision be affirmed.

## Introduction

A state or local government retirement system is designed, fundamentally, to fund the long term cost of providing benefits to employees. Thomas P. Bleakney, *Retirement Systems for Public Employees* 33 (Univ. of Penn. Press 1972). The latter is so, because, "there is a time lag between the accruing of pension rights and the payment of benefits." *Id.* at 14. Retirement benefits are funded by the interplay of three sources, namely, contributions from the employer, contributions from the employee, and investment income. Employer contributions are calculated, moreover, so that over the long run, annual contributions plus investment earnings are sufficient to pay out the promised benefits. *The Top 10 Advantages of Maintaining Defined Benefit Pension Plans,* http://www.macrs.org/news/96–the–top–10–advantages–of–maintaining–defined–benefit–pension–plans.html (last visited July 16, 2011). In this way, the financial workings of a public employee retirement system have been compared to a water network, with the

> Inputting to this reservoir are three flows: employee money, employer money, and earnings on the investments of the fund. The outflow is for benefit payments and administrative expenses. So long as the reservoir is not empty, the system will continue to operate. Because the input from employee contributions and investment earnings is not easily altered, proper design of the system requires anticipation of the expected outflow in advance, so that the demands on the employer can be scheduled. This is the essential scope

of financing techniques-measuring the anticipated outflow and regulating the rate of input of employer contributions into the fund.

Bleakney, *supra*, at 106–07.

Actuaries come into a retirement process because they focus primarily on "analyzing the financial consequences of future uncertain events." Michael A. Bean, *Probability: The Science of Uncertainty* 6 (American Mathematical Society 2001). In the pension context, actuaries perform complex calculations to ensure that employer contributions are sufficient to fully satisfy the liabilities of a fund over time, despite fluctuations in investments and the steadily growing number of retirees. *The Top 10 Advantages of Maintaining Defined Benefit Pension Plans*, http://www.macrs.org/news/96–the–top–10–advantages–of–maintaining–defined–benefit–pension–plans.html (last visited July 16, 2011). In formulating estimates of employer contributions, "planning for error is part of the calculation," and actuaries often employ "a degree of conservatism in [their] assumptions," erring on the side of over-funding rather than under-funding. *Rhoades, McKee & Boer v. United States*, 43 F.3d 1071, 1075 (6th Cir.1995).

In Maryland, the State Retirement and Pension System is composed of ten independent retirement systems,[3] although

---

**3.** Section 21–102 of the State Personnel and Pensions Article, Maryland Code (1993, 2004 Repl.Vol.), provides:

The State Retirement and Pension System consists of:

(1) the Correctional Officers' Retirement System, established on July 1, 1974;

(2) the Employees' Pension System, established on January 1, 1980;

(3) the Employees' Retirement System, established on October 1, 1941;

(4) the Judges' Retirement System, which consists of:

 (i) the contributory plan, established on July 1, 1969; and

 (ii) the noncontributory plan, established on April 7, 1904;

(5) the Legislative Pension Plan;

(6) the Local Fire and Police System, established on July 1, 1989;

(7) the Law Enforcement Officers' Pension System, established on July 2, 1990;

(8) the State Police Retirement System, established on July 1, 1949;

(9) the Teachers' Pension System, established on January 1, 1980;

only three were the subject of the challenge initiated by the State against Milliman, those being the Judge's Retirement System, the State Police Retirement System, and the Law Enforcement Officers' Pension System, all of which are managed by a Board of Trustees, which includes the Secretary of Budget and Management, the State Comptroller, the State Treasurer, and elected or appointed representatives of each retirement system. Pursuant to Section 21–125(a) of the State Personnel and Pensions Article, Maryland Code (1993, 2004 Repl.Vol.),[4] the Board of Trustees "shall designate an actuary" to:

> (1) give technical advice to the Board of Trustees on the operation of the funds of the several systems; and

> (2) perform other related duties that the Board of Trustees requires.

The designated actuary is required to make an annual "valuation of the assets . . . of the funds of the several systems," upon which the State's (the employer's) contributions to the System are based:

> (b) *Annual valuation.*—(1) On the basis of actuarial assumptions that the Board of Trustees adopts, each year the actuary shall make a valuation of the assets and liabilities of the funds of the several systems.

> (2) Each year the Board of Trustees shall certify to the Secretary of Budget and Management and to the Governor the rates of employer contributions.

Section 21–125(b) of the State Personnel and Pensions Article. Moreover, Section 21–304 of the State Personnel and Pensions Article establishes a statutory goal for the System to have its

---

(10) the Teachers' Retirement System, established on August 1, 1927; and

(11) any other system or subsystem that the Board of Trustees administers.

**4.** All references to the State Personnel and Pensions Article throughout are to Maryland Code (1993, 2004 Repl.Vol.), unless otherwise noted, although the pertinent provisions remain unchanged in the 2009 Replacement Volume.

obligations to participants fully funded by the year 2020, as follows:

(d)(1) Beginning July 1, 2001, each year the Board of Trustees shall set contribution rates for each State system that shall amortize:

(i) all unfunded liabilities or surpluses accrued as of June 30, over 20 years; and

(ii) any new unfunded liabilities or surpluses that have accrued from July 1 of the proceeding fiscal year over 25 years to reflect:

1. experience gains and losses;

2. the effect of changes in actuarial assumptions; and

3. the effect of legislation effective on or after July 1, 2001.

## Background

Milliman contracted with the System beginning in 1982 to provide actuarial valuations for each of the State's retirement and pension systems and continued to serve as actuary by additional contracts effective July 1, 1990, July 1, 1993, and August 5, 1998, to terminate as they did, August 4, 2006. The contracts required Milliman to perform valuations of the various funds, as well as an "annual certification of the employer contribution rate required to fund each retirement system for the coming year." Milliman assured the System that the actuary "subscribe[d] to the concept that the annual actuarial valuations are the cornerstone of all financial planning of a retirement system. As such we take great care in assuring that all technical aspects of the valuation are completed."

In 2004, Milliman discovered, through a "replication audit," [5] a coding error affecting the three retirement systems, in

---

**5.** According to the testimony of Brent Mowery, an actuary with the Hay Group, Milliman discovered the coding error through an "internal audit":

They had another office do essentially an attempt to replicate the valuation performed by the office responsible for the Maryland valuations. And so that apparently sometime prior to finalization of the 2004 results in October identified internally we've got a problem.

which the actuary failed to include in its calculations benefits payable to surviving spouses of judges and police officers. Thereafter, Milliman reported its discovery of the valuation errors to the System and indicated that liabilities for the three affected systems had been understated by more than $130 million. To provide expert advice concerning the longstanding actuarial error, the System retained the Hay Group, "a global human resource management consulting firm," which examined Milliman's work and determined that "Milliman's errors did result from their failure to apply reasonable standards of care as would have been expected of an actuary at that time."

By formal authorization of its Board of Trustees, the System approved the filing of an administrative claim against Milliman pursuant to Section 15–219.1 of the State Finance and Procurement Article, Maryland Code (2001, 2006 Repl. Vol.).[6] The Retirement System Procurement Officer determined that Milliman had breached its actuarial responsibility,

---

Milliman Philadelphia gets a different result from Milliman DC. And they dug into it and said Milliman DC doesn't quite have it right.

**6.** Section 15–219.1 of the State Finance and Procurement Article, Maryland Code (2001, 2006 Repl.Vol.), governing a "[c]ontract claim against a contractor," provides, in pertinent part:

(2) On receipt of a contract claim from a unit, a procurement officer:
(i) shall review the substance of the contract claim;
(ii) may request additional information or substantiation through an appropriate procedure; and
(iii) may discuss or, if appropriate, negotiate the contract claim with the unit or contractor.
(3) The procurement officer shall proceed under subsection (b) of this section if the contractor fails to respond, provides an inadequate response, or denies the contract claim or the relief sought by the unit in whole or in part.
(b) *Proposed decision upon claim when no resolution is reached.*——(1) If the contractor and the unit do not resolve the contract claim, the procurement officer shall prepare a proposed decision on the contract claim, including:
(i) a description of the contract claim;
(ii) references to pertinent contract provisions;
(iii) a statement of factual areas of agreement or disagreement; and
(iv) a statement in the proposed decision wholly or partly granting or denying the relief sought, with supporting rationale.

resulting in $73 million in losses to the System, and Milliman appealed to the Board.

The Board of Contract Appeals determined that Milliman substantially breached its contracts with the System by failing to exercise reasonable care and diligence in interpreting data in connection with the three affected retirement systems, in contravention of the professional actuarial standard of care:

76. As actuarial customs and practices have evolved and become generally accepted standards of care, they have been reduced to writing and adopted by appropriately accredited professional associations as statements of duties and responsibilities required to be employed by actuaries in the course of rendering reasonable actuarial care and advice.

77. The actuarial *Guides to Professional Conduct* originally written in 1969 was replaced in 2005 by the actuarial *Code of Professional Conduct* and in addition to those learned treatises expressing accepted written statements of actuarial professional standards, since the late 1980s, the generally accepted professional standards of care for the actuarial profession have been established, written and promulgated by the Actuarial Standards Board (ASB), the successor professional organization to the American Academy of Actuarials.

78. In addition to the officially adopted and promulgated written standards of care for the actuarial profession, there are also generally accepted standards of practice for actuaries which are unwritten but nonetheless constitute professional standards of care which contribute to expert assessment of how the requisite standard of professional care must be exercised in particular actuarial settings.

79. The following written expressions of standards of professional actuarial care in these Findings of Fact were applicable at all times relevant to the issues presented in this appeal even though they may not have been formally written and adopted until after the time at which breach of the written standard is here alleged to have occurred.

80. The historic Guides to Professional Conduct adopted by the American Academy of Actuaries states: "The actuary will act for each client or employer with scrupulous attention to the trust and confidence that the relationship implies and . . . [t]he actuary will exercise his best judgment to ensure that any calculations or recommendations made by him or under his direction are based on sufficient and reliable data."

81. Actuarial Standard of Practice (ASOP) No. 4 pertaining to recommended practices for data analysis, developed by the Pension Committee of the Actuarial Standards Board, and adopted by the full Actuarial Standards Board in October 1993 provides, "5.2.2—All provisions of the plan adopted and effective on or before the start of the plan year should be taken into account in measuring pension obligations."

82. ASOP No. 4 further provides: "5.2.3(a)—The actuary will generally rely on the plan administrator, plan sponsor or other qualified third party for asset and participant information. While not responsible for auditing the information, the actuary should verify its reasonableness both directly and against other available information, such as prior years' data and reported benefit payments. If the actuary is not satisfied as to the reasonableness of the information, further inquiry should be made until the actuary is so satisfied."

83. ASOP No. 23 pertaining to data quality was initially written in the mid 1990s, refined by the General Committee of the Actuarial Standards Board, and adopted by the full Actuarial Standards Board in December 2004 to apply to all actuarial practice areas, stating: "3.4—Reliance on Other Information Relevant to the Use of Data—In many situations, the actuary is provided with other information relevant to the appropriate use of data such as contract provisions, plan documents and reinsurance treaties. The validity and comprehensiveness [as contrasted to clarity] of such information are the responsibility of those who supply such information.

The Board also found that Milliman had misinterpreted retirement code "00," resulting in an understatement of contributions necessary to fund three of the State's ten retirement and pension funds:

108. Code "00" was in fact a straight life annuity form of benefit payment for most MSRPS participants, but not for employees enrolled in the judges or police retirement systems, who also were provided a 50% surviving spousal benefit in addition to the single life annuity enjoyed by other retirees.

109. At the hearing in this appeal, a competent, qualified, practicing actuarial professional offered expert testimony to support the legal conclusion that the foregoing incorrect interpretation of MSRPS codes constituted a breach of the applicable standard of professional care on the part of Milliman as the expert actuarial consultant retained by MSRPS for actuarial advice and support in 1982.

110. Milliman was provided by MSRPS with a booklet describing the benefits payable under the State police pension plan in which it was stated, "A member of the Maryland State Police Retirement System with a spouse as of the date of retirement must elect the maximum retirement allowance ... At the retiree's death, one-half of the monthly retirement allowance will be paid to the surviving spouse for life."

\* \* \*

112. Because the nature of the retirement benefit identified by code "00" varied depending on the particular retirement system in which the participant was enrolled, "00" on the retirement coding tape meant a straight life annuity for teachers, for example, but for judges and State Police "00" meant a straight life annuity plus a 50% benefit for surviving spouses as the maximum or normal form of payment.

113. In its evaluation methodology Milliman failed to recognize that the code "00" for retired judges and State Police included a 50% benefit for surviving spouses in addition to a straight life annuity.

114. In the course of Milliman's calculations from 1982 until 2004, Milliman regarded the code "00" as meaning only a straight life annuity for all of the State's retirement systems even though Milliman should have known that the code "00" actually was not just a straight life annuity for judges and State Police but also included a continuing 50% benefit for surviving spouses of participants enrolled in those two (2) particular retirement systems.

* * *

173. Milliman discovered in 2004 that it made a coding error in its methodology for evaluating the Maryland State Police retirement system initiated 22 years earlier.

174. As a result of Milliman's discovery in September 2004 of the coding error for the Maryland State Police due to the replication audit conducted by Milliman's Philadelphia office, Milliman reviewed its methodology on other of Maryland's retirement systems and learned that the same error was made for LEOPS [Law Enforcement Officers' Pension System], judges and legislators, which, like the State Police, had been evaluated on the assumption of recipients' entitlement only to straight life annuity rather than the more costly benefits associated with dual lifetime benefits.

175. Milliman admits that it made a coding error in 1982 on a small fraction of the named beneficiaries and that that coding error was subsequently replicated each year until October 17, 2004, when the error was discovered and promptly reported to MSRPS.

176. As a result of the aforementioned coding error, the MSRPS police and judges retirement and pension plans were underfunded from 1982 until 2004.

* * *

182. Each year from 1982 until discovery of the coding error in 2004, the contribution rates certified by Milliman to MSRPS were not set in compliance with Maryland's statutory requirements for funding the retirement systems enjoyed by judges and State Police.

Specifically, the Board found that the affected retirement systems were not on track to achieve full funding by the statutory 2020 date, but instead, that "the State Police retirement system was funded at a level of 84% of liability, judges at 74%, and local law enforcement at 60%," so that increased contributions to make up for those deficiencies became necessary. The Board determined that the sum "needed to make [the System] whole from the losses sustained as a result of Milliman's errors," included approximately $34 million in deficient contributions plus $38.8 million in lost interest on those contributions during the twenty-two year period:

223. Calculated on the basis of the sum needed to make MSRPS whole from the losses sustained as a result of Milliman's errors, and determined within a reasonable degree of certainty, the damages incurred by MSRPS to the three (3) affected systems totaled $72,965,148 as of 2005, that figure representing all funding contribution deficiencies since 1983 resulting from Milliman's actuarial calculation errors.

224. The aforesaid $72,965,148 total loss incurred by MSRPS includes $34,208,960 in deficient contributions over the course of the 22–year period during which the coding error was made plus $38,756,188 in lost interest on the investment return on that deficiency during the period involved, each year compounded.

In so doing, the Board rejected Milliman's argument that the System was not damaged insofar as the taxpayers would fund any deficiency, because that "perspective subvert[ed] the entire function and purpose of actuarial analysis":

An additional one of Milliman's alternative arguments against the award of any damages in the face of a determination of breach and liability is that MSRPS is not harmed, because, notwithstanding 22 years of Milliman's actuarial errors, it is undisputed that ultimately the retirement and pension systems will be fully funded in accordance with law. Of the $132 million shortfall of which $73 million needs to be repaid over time in order to accrue with interest and restore the full amount of that $132 million deficiency by the year

2030, nearly $20 million has already been paid to make up for that deficit. This position has some merit in that State tax revenue is used to achieve future full funding of MSRPS liability, whether or not the allocation of those State funds is or was made at the appropriate time, or at some other time. However, this perspective subverts the entire function and purpose of actuarial analysis, which is to determine how much to contribute and when.

If the Board were to accept this argument, an actuary could satisfy its contractual obligations to a client by training a monkey to punch random keys on a calculator. MSRPS, the Governor, and Legislature could agree to appropriate the amount thus randomly determined to be allocated toward pension funding, with the understanding that some group of State taxpayers sometime in the future would make up the difference in the event of a deficit or reap the rewards in the event of a surplus, and the actuary would always be held harmless for any calculation error, no matter its basis or magnitude. Certainly, this is not an acceptable standard of professionalism for actuaries, nor is it the one in force, nor would its adoption benefit any actuarial firm, nor does such a lax standard characterize the usual excellent work of the competent, impressive, highly trained, skilled, and careful actuarial experts engaged by Milliman. Instead, the approval of such an argument would render actuarial calculations pointless.

Adopting this position would also undermine the extremely important statutory objectives of leveling contributions, protecting inter-generational equity, and pre-funding defined benefits. That the losses incurred by MSRPS have now been amortized and already partially restored is irrelevant to Milliman's responsibility because the reimbursement made to date is from a collateral source, namely budgets adopted in years subsequent to the years and in different amounts than the appropriations that should have been made and would have been made but for Milliman's error.

The Board also concluded that, because the State was not a party to the proceeding, Milliman's contention that any losses

sustained by the System as a result of Milliman's calculation errors must be offset by assets that purportedly remained in the State's General Fund, was without merit:

A more persuasive position on the question of damages was posited by [Timothy F.] Maloney, explained during his testimony using a "right pocket/left pocket" analogy referenced in Milliman's brief as the "unitary creditor doctrine." By this argument, Milliman asserts that the State is a single entity comprised of many constituent agencies like MSRPS. Funds that are taken from the General Fund, or right pocket, and deposited into sub-entities like MSRPS, the left pocket, do not result in any gain or loss to the entity itself, only transfers from one pocket to another in a single pair of pants.

This conception is accurate to the extent that MSRPS is an appendage of the State of Maryland. MSRPS is indeed a component of the State. It is created by State law. MSRPS carries out an important State function upon which State employees, retirees and their families rely. The full faith and credit of the State stands behind MSRPS liabilities. The State lists and includes MSRPS funds as a part of its fiduciary assets. The State is guarantor of MSRPS obligations. The Governor of the State authorizes state revenue to be allocated to MSRPS as a part of the annual State budget in accordance with State law and that appropriation is authorized by approval of the State Legislature.

However, the State of Maryland is not a party to this proceeding. As fully substantiated by examples and succinctly but effectively expressed by counsel for Milliman in its brief at page 68, "The System [MSRPS] cannot be heard here to complain on behalf of the State. The claim before the Board is a claim by the System on behalf of the System. The System has been adamant in the position that the State is not a party to this proceeding and has repeatedly taken the position in pleadings and correspondence that the State is not a party to the claim and plays no role in this case. . . . The Board heard no evidence from the State, or any witness purporting to speak on behalf of the State . . . ." and at page

21 of its reply brief, "the System does not speak for the State, or the taxpayers, neither of whom are parties to this case." Or as one might assert using Maloney's pants pocket analogy, only the left pocket is a party to this proceeding. Impact of the instant decision upon the right pocket, the General Fund, is irrelevant to the specifically and deliberately limited claim of the left pocket, MSRPS.

As a matter of law, funds held by MSRPS are quite distinct from all other State funds. As Maloney intimates, the State maintains many funding pools for which various program supporters are inclined to view such funds as separate and independent from the General Fund, sacrosanct from expenditures other than those for which revenue has been specifically directed and restricted, the Transportation Trust Fund or Program Open Space, for example. Yet, Maloney would correctly assert, whenever the Legislature is in session, it is conceivable and possible to change the rules, repeal restrictions and raid funds intended for one purpose in order to use them for another. In this sense restricted pots of revenue are all part of the State's assets and may legally be transferred for General Fund use should the Governor and Legislature so desire and therefore facilitate enactment of a change in law, irrespective of whether or not such action would constitute good public policy.

Finally, the Board concluded that the System was not contributorily negligent, because it was ultimately Milliman's professional obligation to "understand the data" and seek clarification from the System:

The only qualifying obligation on the part of MSRPS as plan sponsor is accurately to reflect the meaning of its codes as a part of its data dictionary, which MSRPS achieved when it provided to Milliman its written Annual Valuation Record and Codes and Flags memorandum. Those documents, viewed in light of the pertinent statutes and employee brochures describing retirement payment provisions, were sufficient to notify Milliman fully and fairly of the meaning of relevant MSRPS codes. Milliman has undoubtedly seen and continues to encounter innumerable variances

in the meaning of a multitude of alphanumeric codes used by disparate pension plan sponsors. Indeed, as more elaborately discussed above in this Decision, to the extent that the coding used by MSRPS was confusing to Milliman, the actuary bore the obligation of soliciting further clarifying information until it accurately understood the information provided to it by its client. Having previously asserted, "the data furnished to us are, in our opinion, sufficient and reliable for the purposes of our calculations," Milliman is estopped from asserting today that the data furnished to it by MSRPS was deficient. Though it is certainly true that MSRPS might have done a different and even a better job with its data dictionary, it cannot be said as a fair or fitting legal conclusion that MSRPS was negligent in the development or transmission of the coded data it provided to its actuary. As a consequence, Milliman's breach of contract is not excused by any conduct on the part of MSRPS.

After Milliman sought judicial review in the Circuit Court for Baltimore City, the judge affirmed the Board's decision involving Milliman's breach, but determined that the Board erred in calculating damages to include both lost contributions and lost interest on those contributions:

[T]he State's argument is right and the Court agrees that in fact the obligations in total should not be that of the State and should be primarily and for the purpose of damages, the obligation of the true obligor, which is the beaching party which was not the State legislative body. It was the actuary. And that in so doing, it is that the said systems did not have the ability to contribute the funds and the responsibility of the Legislature or the State legislative body is not to make up what in fact would have been the investment flowing therefrom.

And therefore, the question becomes as to what would have been the actual investment returns or use benefit to the systems.

The Court again states that we cannot nor could the Board speculate as to what investment interest would yield in the future. However, in this case, we are not looking at

whether or not in fact the interest in the future would have been 18 percent profit we all wish as we get older, close to retirement. Nor is it reasonable to speculate that it would be at 0.25 percent as in some of the local credit unions, if you would, please—not that we have any knowledge of those things. That under the circumstances in this case the finding of the Board was that there was $39 million in lost use of the funds based on looking at that which occurred between 1982 and 2005.

While the Court recognizes that the systems may believe and so argue that the party responsible for both of those should be that of Milliman, this Court finds as a matter of law that in fact Milliman did breach and is responsible for damages and defined damages is lost use of those funds for the systems. And the lost use by the evidence is $39 million.

The Court finds that it reaches that conclusion as a matter of law, that by substantial evidence in applying the law on contracts it is the same figure of $39 million. The Court therefore affirms in part the decision of the Board that Milliman did breach its contract and breached its standard of duty as required under the actuarial standard operations procedure. Not quoting each of those, but it's definitely in the long list of findings of the said Board; that under the circumstances, the Court reverses as a matter of law as to the damages and does find as the substantial evidence that the amount of damage is $39 million plus all costs in this case to date.

## Discussion

 Our role in reviewing the final decision of an administrative agency, such as the State Board of Contract Appeals, is "limited to determining if there is substantial evidence in the record as a whole to support the agency's findings and conclusions, and to determine if the administrative decision is premised upon an erroneous conclusion of law." *Maryland Aviation Admin. v. Noland,* 386 Md. 556, 571, 873 A.2d 1145, 1154 (2005), quoting *Board of Physician Quality Assurance v.*

*Banks,* 354 Md. 59, 67–68, 729 A.2d 376, 380 *(1999).* In doing so, our task is to decide whether the Board's determination was supported by "such evidence as a reasonable mind might accept as adequate to support a conclusion." *People's Counsel for Baltimore County v. Surina,* 400 Md. 662, 681, 929 A.2d 899, 910 (2007); *see also Mayor of Annapolis v. Annapolis Waterfront Co.,* 284 Md. 383, 398–99, 396 A.2d 1080, 1089 (1979) ("The heart of the fact-finding process often is the drawing of inferences made from the evidence.... The court may not substitute its judgment on the question whether the inference drawn is the right one or whether a different inference would be better supported. The test is reasonableness, not rightness."). As a result, a reviewing court must "defer to the agency's fact-finding and drawing of inferences if they are supported by the record." *Motor Vehicle Admin. v. Shea,* 415 Md. 1, 14, 997 A.2d 768, 775–76 (2010), quoting *Motor Vehicle Admin. v. Delawter,* 403 Md. 243, 256–57, 941 A.2d 1067, 1076 (2008). Moreover, a reviewing court "must review the agency's decision in the light most favorable to it; ... the agency's decision is prima facie correct and presumed valid." *Noland,* 386 Md. at 571, 873 A.2d at 1154, quoting *CBS v. Comptroller,* 319 Md. 687, 698, 575 A.2d 324, 329 (1990). When we review the decision of an administrative agency, we look "through the circuit court's ... decision[ ], although applying the same standard of review, and evaluate[ ] the decision of the agency." *Shea,* 415 Md. at 15, 997 A.2d at 776, quoting *People's Counsel for Baltimore County v. Loyola College in Md.,* 406 Md. 54, 66, 956 A.2d 166, 173 (2008).

In addressing the first question raised by Milliman, it appears that we must confront a twofold issue, the first being whether there was substantial evidence supporting the Board's finding of underfunding, and second, whether the damages emanating from the underfunding were caused by errors in Milliman's actuarial recommendations.

In our initial review, we consider the record as a whole to determine whether the Board's findings are supported by substantial evidence. *Najafi v. Motor Vehicle Administra-*

*tion,* 418 Md. 164, 173, 12 A.3d 1255, 1261 (2011); *Critical Area Commission v. Moreland,* 418 Md. 111, 122–23, 12 A.3d 1223, 1230 (2011). In addition to numerous exhibits supporting its underfunding contention, the System also called various individuals including Major Morris Krome, an elected member of the Board of Trustees representing the Maryland State Police Retirement System, who testified as follows:

[Counsel]: Can you tell the members of the Board whether or not the Milliman actuaries told the Board that liabilities had to be increased because of the error?

[Major Krome]: They did.

[Counsel]: And looking at the chart on page 2, can you tell the Board by how much did liabilities increase as a result of this issue?

[Major Krome]: I believe the figure is $87.2 million.

[Counsel]: And that's for the State Police?

[Major Krome]: Yes.

[Counsel]: And for the Judges'?

[Major Krome]: $24.8.

[Counsel]: And for the Law Enforcement Officers' System?

[Major Krome]: S 16.1 million.

[Counsel]: And the total amount they increased liabilities as a result of this error?

[Major Krome]: $131.7 million.

In addition, Brent Mowery, an actuary versed in pension matters employed by the Hay Group, testified that Milliman's errors caused each of the affected systems to be underfunded pursuant to the statutory funding goals, as follows:

[Counsel]: My question is how does knowing what the funding goals are play into the valuation process? Again, if simply, you can just explain that to the Board.

[Mr. Mowery]: The actuary in developing the funding requirement for the upcoming year must take the funding goals, in this case statutorily established, and prepare a result which is consistent with those goals.

[Counsel]: So, for example, there was testimony earlier from Treasurer Kopp that in 1982 the statutory funding goals for the systems in the Maryland State System was to be fully funded by the year 2020. In your mind, is that a funding goal?

\* \* \*

[Mr. Mowery]: What we learned early on from reading the 1982 evaluation results was that in 1980 it was established that there would be a goal of reaching full funding over a 40 year period with respect to the unfunded accrued liability that existed in 1980 which, in essence, does take it to 2020, and we did understand that was [the] statute.

[Counsel]: And my follow-up question then is how would a reasonable professional actuary doing the valuation in 1982 have to factor that funding goal into the valuation process?

[Mr. Mowery]: If came in the form of Milliman recognizing that with two years down and 38 to go, the remaining amortization period for the unfunded accrued liability was 38 years, and they calculated valuation results on that basis.

\* \* \*

[Counsel]: And in your opinion, would payment by Milliman of the approximately $73 million that you calculated place the systems in the positions they would have been in 2005 absent Milliman's mistake in this case?

[Mr. Mowery]: Yes. If this number, approximately $73 were deposited by Milliman as of June 30, 2005, my belief would be that the System was made whole or would have recovered the loss associated with the Milliman errors.

[Counsel]: Can you explain conceptually why the $73 million would have been sufficient to amortize as of 2004, 2005 $128 million in additional liabilities?

[Mr. Mowery]: Yes. That has to do with the fact that Milliman's measurement of the error in October 2004 was measuring a liability that had not up until then been accounted for. The fact is that that liability had it have been recognized from the start back in 1982 would have been partially funded through these annual amortization of un-

funded liability payments. And what has occurred by the point in time of 6/30/05 is part of the $128 million liability has been funded. Part of it through the contributions and part of it through, you know, net favorable investment returns over that period.

[Counsel]: Is, is the size of the amount of damages here, the $73 million, a result of the nature of the mistake or of the time it was allowed to continue?

[Mr. Mowery]: It's both. It's a combination of the two. And we, by virtue of observing that the average return on investment over that 22–year period was as high as 11 percent, whereas the actuarial investment return assumption over those years was below that, well below that, there has been factored in here an influence that actually raises the level of shortfall or loss suffered by the systems.

[Counsel]: If the mistake had been caught any time prior to 2004, would the financial consequences to the systems have been significantly different?

[Mr. Mowery]: Yes. And it's kind of proportionate. The earlier it might have been caught and corrected, the lower the cumulative impact. So, yes, it's true the number would not be nearly this high if the error had been applicable over a shorter period of time and had been corrected earlier.

Finally, Dr. Ann Melissa Moye, a member of the System's Board of Trustees in 2004, testified that the three affected retirement systems were significantly underfunded at levels ranging from 60 percent to 84 percent, as follows:

[Counsel]: Dr. Moye, you've said that but for Milliman's error in this case, the System would have collected additional contributions from '84 through 2005. Is that right?

[Dr. Moye]: Yes.

[Counsel]: And what was the amount?

\*　　\*　　\*

[Dr. Moye]: Right. It would be $34 million.

\*　　\*　　\*

[Counsel]: And with regard to the systems at issue in this case, do you have a knowledge of their funded status?

[Dr. Moye]: I do although not at, you know, as of after the market drop, they would be components of that broad range I gave you of between 60 percent and 70 percent. As of the last actuarial valuation that we received, June 30th of last year—well, the State Police, for example, is at 84 percent having dropped from about 88 percent. LEOPS, the Law Enforcement Officers is less than that, it's in the 60s. And the Judges is around 74, I think it is.

Milliman asserts, relying on the testimony of Dr. Kim Nicholl, an actuary employed by Price, Waterhouse, Coopers, that the "System was not damaged because the coding issue resulted in it having made slightly fewer contributions in the past, because Milliman's funding recommendations over its tenure as actuary led the State to make more contributions than were necessary to the System." Dr. Nicholl testified that Milliman's recommended contribution rates fell within "the range of reasonableness."

[Dr. Nicholl]: What this graph shows is the contribution rate for the State Police from 1982 through 2004, and there's two lines. It's hard to see up on the wall, but there's a purple line and an orange line, or a blue line and an orange line. And the blue line is the contribution rate that Milliman recommended to the Board for the State Police. And the orange line is what the contribution rate would've been with the liability for the retirees added on. And it's my opinion that these lines are so close together that, really, they're equivalent as far as actuarial reasonableness is concerned, that the numbers are so close together that you can't say one is right and the other is wrong.

[Board Member]: And you're referring to the comparison between the actual—the actual funding recommendation that was made by Milliman during that time, and then Mr. Mowery's corrected version?

[Dr. Nicholl]: That's right. My opinion is that the two are—if you look at these two lines, they are very close. In

fact, you know, the orange line just sits on top of the blue line. It's not even—it just—they're so close together that I have to say these are equivalent, and both of them fall in the range of reasonableness.

✻ ✻ ✻

[Counsel]: And again, if you could just briefly describe this chart and the information that's conveyed on it.

[Dr. Nicholl]: This is a chart very similar to the police, State Police chart. It shows the contribution rate from 1984 through 2004 for the Judge's plan. And again, the blue line is the total contribution rate that Milliman's valuation produced, and the orange line is what that rate would've been had the coding error not been—had the coding issue been included in the contribution rate. And, you know, similar to the police, you can see that the two lines are right next to each other. In my opinion, they are both within the range of reasonableness. I would say that the blue line falls clearly within a range of reasonableness, and that the plan has—you know, the contribution rate, while it hasn't declined like we sae the police plan decline, it has gone down a little bit over the years.

✻ ✻ ✻

[Counsel]: And this is a similar chart for LEOPS?

[Dr. Nicholl]: Yes.

The Board, however, credited the testimony and evidence presented by Major Krome, Mr. Mowery, and Dr. Moye rather than that of Dr. Nicholl regarding whether Milliman erred or not. Clearly, there was substantial evidence upon which the Board relied to support its finding that the System had suffered losses totaling $73 million and that the affected systems were thereby underfunded as a result of Milliman's coding errors.

■ To address the second question, namely, how to measure damages caused by errors in actuarial recommendations related to pensions systems, we lack statutory guidance as

well as precedent. As a result, we turn to analogous decisions from our sister states to seek assistance.

In *Dardaganis v. Grace Capital Inc.*, 889 F.2d 1237 (2d Cir.1989), the Trustees of the Retirement Fund of the Fur Manufacturing Industry entered into an agreement with Grace Capital, Inc., in which Grace became investment manager of the assets of the retirement fund and promised to "manage the [Fund's] Account in strict conformity with the investment guidelines promulgated by the Trustees." *Id.* at 1239. Pursuant to the investment guidelines, Grace was prohibited from investing more than fifty percent of fund assets in common stocks. During an eight month period, however, Grace invested more than fifty percent of fund assets in common stock, exceeding the fifty percent ceiling each month by an average of fifteen percent. The Trustees refused to increase the ceiling above fifty percent, and Grace was fired when the common stock holdings increased to approximately eighty percent of the portfolio.

Thereafter, the Trustees brought suit, alleging that Grace had breached a fiduciary duty embodied in 29 U.S.C. § 1104(a)(1)(D),[7] by failing to adhere to the common stock ceiling. The federal district court granted the Trustees' motion for partial summary judgment on the issue of liability, holding that Section 1104's requirement that fiduciaries abide by the plan documents together with the agreement's provision that Grace manage the fund "in strict conformity with the investment guidelines," required the court to conclude, as a matter of law, that "[a]ny violation of the terms of [the] [a]greement constitute[d] a breach of Grace Capital's fiduciary duty under § 1104(a)(1)(D) and create[d] liability to the Fund." *Darda-*

---

**7.** The federal statute, known as ERISA, was enacted by Congress to accomplish two broad goals, namely "safeguarding the interests of [employee benefit] plan participants and encouraging employers to offer such plans." *Eid v. Duke*, 373 Md. 2, 11, 816 A.2d 844, 849–50 (2003). ERISA sought to protect the interests of participants "by providing for appropriate remedies, sanctions, and ready access to Federal courts." *Id.*, 816 A.2d at 850, quoting 29 U.S.C. § 1001(b). ERISA is not implicated in the present controversy.

*ganis,* 889 F.2d at 1239. The district court awarded damages by comparing what the plan actually earned with what it would have earned had Grace invested only fifty percent of the fund's account in equities.

On appeal, Grace asserted that "even if [it] breached a duty, there were no 'losses' to the plan, because the sum of the Fund's assets and the cash withdrawn to meet Fund obligations increased during their tenure." *Dardaganis,* 889 F.2d at 1243. The Second Circuit Court of Appeals affirmed the trial court, reasoning that the Fund has suffered losses as a result of Grace's breach, and any award of damages should take into account the financial position the beneficiaries would have occupied, but for the breach:

> [A]n "appropriate remedy in cases of breach of fiduciary duty is the restoration of the trust beneficiaries to the position they would have occupied but for the breach of trust." [*Donovan v. Bierwirth,*] 754 F.2d [1049, 1056 (2d Cir.1985)]. If, but for the breach, the [f]und would have earned even more than it actually earned, there is a "loss" for which the breaching fiduciary is liable.

*Id.* at 1243. In *Dardaganis,* therefore, an investment manager was required to compensate a fund for losses stemming from a breach of the standard of care, no matter whether the fund's assets grew as a whole, to place the fund in the position it would have been in but for the breach.

We also find helpful to our analysis an unpublished opinion of the California intermediate appellate court, *Board of Trustees v. Mercer,* 2003 WL 21481021, 2003 Cal.App. Unpub. LEXIS 6236 (Cal.Ct.App.2003), in which the Board of Trustees for the San Luis Obispo County Pension Trust as well as the County of San Luis Obispo filed a claim against their former actuary, Mercer, for professional negligence. In the case, presenting factual circumstances remarkably similar to the present case, the trust paid a defined benefit and was funded by contributions from the county and its employees and income from the investment of trust assets. Mercer was the trust actuary from 1980 through 1996, when the actuary

discovered errors in the computer program it used in preparing actuarial valuations for the trust, including an assumption that plan participants would have no surviving spouses. As a result, Mercer failed to account for the payment of survivors' benefits, such that "the trust's future liabilities were underestimated and its assets were overestimated." *Id.* at *1, 2003 Cal.App. Unpub. LEXIS 6236 at *3.

At trial, Mercer admitted breaching the actuarial standard of care, but disputed liability, because "in spite of its errors, the trust was fully funded" and therefore, "suffered no damages." *Id.* at *2–3, 2003 Cal.App. Unpub. LEXIS 6236 at *6–7. The trial judge determined that the trust suffered a loss of investment income on the nearly $11 million the county undercontributed to the fund. The appellate court affirmed, rejecting Mercer's contention that the award of lost interest would amount to "an impermissible windfall." *Id.* at *4, 2003 Cal. App. Unpub. LEXIS 6236 at *12. Instead, the court recognized that although the "county may derive an incidental benefit from Mercer's payment of damages to the trust, as will county employees and all taxpayers living within the county," awarding damages for lost investment income would place the county in the position it would have been in had Mercer properly valued the pension's assets and liabilities. *Mercer* suggests that whether a pension fund is fully funded is immaterial in calculating damages, when an actuary has miscalculated pension obligations.[8]

In the present case, Milliman breached its contracts with the System by misinterpreting the "00" code over a period of twenty-two years, thereby causing the System to inadequately

---

8. Milliman asserts that *Board of Trustees v. Mercer,* 2003 WL 21481021, 2003 Cal.App. Unpub. LEXIS 6236 (Cal.Ct.App.2003), demonstrates that the System is entitled only to damages including lost investment earnings, rather than lost contributions. In the case, the trial court refused to award damages to the County for contributions that the County did not make to the pension system, stating that the County "had use of the money." *Id.* at *2, 20023 Cal.App. Unpub. LEXIS 6236 at *6. On appeal, the County did not challenge the trial judge's refusal to award lost contributions and, therefore, that issue was not before the intermediate appellate court.

plan for the costs of retirement benefits to surviving spouses of judges and police officers. Milliman attempts to diminish its culpability for the errors because the System has met its funding goals, as in *Dardaganis* and *Mercer;* the reality is, however, that but for Milliman's miscalculations, the three affected systems would have been more robust. We agree with the Board that to accept Milliman's argument would enable a highly trained, skilled professional to escape liability on the basis of fortuitous economic changes and better than anticipated investment returns, rather than suffer the consequences of the breach of its standard of care.[9]

In this regard, the Board relied upon four standards applicable to actuaries during the contract term, including the historical Guides to Professional Conduct adopted by the American Academy of Actuaries, which provides that

> [t]he actuary will exercise his best judgment to ensure that any calculations or recommendations made by him or under his direction are based on sufficient and reliable data[,]

and also Actuarial Standard of Practice (ASOP) No. 4, pertaining to recommended practices for data analysis, which states that

> [a]ll provisions of the plan adopted and effective on or before the start of the plan year should generally be taken into account in measuring pension obligations.

ASOP No. 4 further provides that the actuary should verify the reasonableness of plan data:

---

9. Milliman refers us to *In re Simon Fraser University Administration/Union Pension Plan*, No. C951466, 1997 B.C.T.C. LEXIS 5309 (B.C.S.C. July 8, 1997), in which a Canadian court determined that an actuary was not liable to a university retirement system for misinterpreting employee salary data, because the actuary's estimation of employee salaries was "generally accepted." *Id.* at 54–55. *Simon Fraser* is inapposite, because, in the present case, the Board determined and we agree that Milliman breached the actuarial standard of care by miscalculating spousal benefits over a period of more than twenty years for the three affected systems. The other cases upon which Milliman relies are also inapposite, because of Milliman's breach of the actuarial standard of care.

> The actuary will generally rely on the plan administrator, plan sponsor or other qualified third party for asset and participant information. While not responsible for auditing the information, the actuary should verify its reasonableness both directly and against other available information, such as prior years' data and reported benefit payments. If the actuary is not satisfied as to the reasonableness of the information, further inquiry should be made until the actuary is so satisfied.

Finally, the Board relied upon ASOP No. 23, pertaining to data quality:

> In many situations, the actuary is provided with other information relevant to the appropriate use of data such as contract provisions, plan documents and reinsurance treaties. The validity and comprehensiveness [as contrasted to clarity] of such information are the responsibility of those who supply such information. The actuary may rely on such information supplied by another, unless it is or becomes apparent to the actuary during the time of the assignment that the information contains material errors or is otherwise unreliable.... A review of data may not always reveal existing defects. Nevertheless, whether the actuary prepared the data or received the data from others, the actuary should review the data for reasonableness and consistency....

We agree with the Board that Milliman breached the articulated standards of care by failing to verify the reasonableness of the information provided regarding the code through inquiry of the System, as early as 1982.

■ Milliman also advances two arguments regarding the relationship of the System and the State, in order to limit its exposure in the present case. Milliman initially contends that the System and the State are the same entity, such that any award of damages "must reflect that the State always retained the use and benefit of contributions not made to the System." The State, however, was not a party before us, nor before the Board, which noted the absence of the State as a party. In an

analogous scenario, in *Hashmi v. Bennett,* 416 Md. 707, 7 A.3d 1059 (2010), we precluded a physician who had been adjudicated as negligent from seeking contribution from three alleged "joint tortfeasors" who were not joined as parties in the original action, because the latter did not have an opportunity to participate in the primary case. In the present case, we similarly cannot countenance Milliman's assertion of "offset" against the State, for the retention of "the use and benefit of contributions not made to the System," because the State was not joined as a party in the proceeding before the Board.[10]

---

**10.** In a related argument, Milliman asserts, relying upon *State v. Hogg,* 311 Md. 446, 467, 535 A.2d 923, 933 (1988), *overruled on other grounds by Dawkins v. Baltimore City Police Department,* 376 Md. 53, 827 A.2d 115 (2003), that state agencies, such as the System "should be treated as one entity legally with their parent State." *Hogg* is inapposite, because the trial judge in that case determined that the State was the "real party in interest" in a claim asserted by the Maryland Deposit Insurance Fund Corporation, an agency specially created by the General Assembly to limit the State's exposure in response to the savings and loan crisis.

Milliman also refers us to an unreported opinion, *Los Angeles County Employees Retirement Association v. Towers, Perrin, Forster & Crosby,* 2002 WL 32919576, 2002 U.S. Dist. LEXIS 27916 (C.D.Cal.2002), as support for the proposition that the System and the State are "the same for the purposes of offsetting damages." In that case, the Los Angeles County Employees Retirement Association, alleged that Tower, Perrin, Forster & Crosby committed repeated actuarial errors over the course of the two decades as the association's actuary and claimed that as a result, the association received approximately $800 million less in contributions that it was entitled to collect, and that it cannot now recover from the County. The actuary asserted that any recovery by the association must be reduced by the amount retained by the County, because "[the association] and the County are effectively a 'closed system.'" *Id.* at *1, 2002 U.S. Dist. LEXIS 27916 at *3. *Towers, Perrin, Forster & Crosby* is distinguishable, however, because the court in that case applied the "unitary creditor" doctrine, applicable in the federal arena, to which we have not ascribed. *Id.* at *9–10, 2002 U.S. Dist. LEXIS 27916 at *31.

The dissent, however, asserts that Maryland has embraced the unitary creditor doctrine, relying on *Lomax v. Comptroller of Treasury,* 323 Md. 419, 420, 593 A.2d 1099, 1100 (1991). The case does not, though, embrace a unitary creditor doctrine, as the federal courts have done, but in the language cited, merely recognizes that the Retirement System and the Comptroller are agencies under the State's control, and that the statute at issue permitted garnishment of state retirement funds by the Comptroller. Where the unitary creditor doctrine has been embraced,

Alternatively, Milliman argues that if the State and the System are regarded as distinct bodies, then the System has failed to demonstrate damages, because the State is obligated to "pay the accrued unfunded liability relating to the coding issue over a period of years." Essentially, Milliman asserts that taxpayers are obligated to fund the retirement systems, so that despite the actuary's repeated errors, outstanding pension liabilities will be funded.

We agree with the Board's assessment that the System and the State are certainly interrelated, because, inter alia, the State serves as guarantor of System pension liabilities, as follows:

(a) *Obligations of the State.*—The following are obligations of the State:

(1) the payment of all allowances and other benefits payable under this Division II;

(2) the creation and maintenance of reserves in the accumulation funds of the several systems;

(3) the crediting of regular interest to the annuity savings funds of the several systems; and

(4) the payment of the expenses for administration and operation of the several systems.

Section 21–302 of the State Personnel and Pensions Article. As further emphasized by the Board, however, funds held by the System are wholly distinct from other State funds. Because we have never had occasion to consider the identity of the System and the State, we again find succor in decisions from other jurisdictions which have faced analogous scenarios.

In *Day v. New Hampshire Retirement System,* 138 N.H. 120, 635 A.2d 493 (1993), Day was diagnosed as having "work-related tendinitis in both wrists" while working as a toll attendant for the Department of Transportation. Although

---

it has been in explicit terms: "[T]he United States is treated as a unitary creditor, and agencies of the United States government . . . may set off debts owed by one agency against claims that another agency has against a single debtor." *Turner v. SBA,* 84 F.3d 1294, 1296 (10th Cir.1996) (*en banc*).

Day received workers' compensation benefits, she was denied "accidental disability retirement benefits" from the retirement system. *Id.* at 494. Day petitioned for a hearing and the retirement board again denied her benefits, reasoning that she had failed to demonstrate that her injury was work-related and that she was permanently incapacitated from performing her duties. When Day sought judicial review in the trial court, the trial judge determined that the retirement system and the department of labor were in "privity," so that the retirement system was collaterally estopped from relitigating the issues that had already been determined in the workers' compensation proceeding. *Id.* at 494–95.

On appeal, the retirement system asserted that it was not in privity with Day's employer, the Department of Transportation, and the New Hampshire Supreme Court agreed, reversing the judgment of the trial court. In so doing, the court held that "because of the distinct identity, constituency and interests of the retirement system, it is not in privity with executive agencies of the State, including the [D]epartment of [T]ransportation," noting salient features of the retirement system, as follows:

> First, the statute makes clear that the retirement system is a qualified pension trust within the meaning of the United States Internal Revenue Code, and as such holds all funds in trust for its members. The retirement system is administered by a thirteen-member board, including two teachers, two permanent police officers, two permanent firefighters, and two employees. Membership is not limited to employees of the State, but also may include employees of counties, cities, towns, school districts, school administrative units, and other political subdivisions. The retirement system is a contributory one to which both employers and employees are required to contribute. The contribution rate for employees is currently fixed by statute, but the employer contribution rate is periodically adjusted by the board in response to biennial actuary reports on the assets and liabilities of the fund. The state treasurer has historically been the custodian of retirement system funds, but the

board retains the power to appoint whomever it chooses to hold that position. Even though the state treasurer may serve as custodian, the funds are not part of the State's general treasury and may only be used for providing retirement benefits. The board has the power to invest the funds in accordance with the limitations placed upon any domestic life insurance company, and may charge the fund for the advice of investment advisors and actuaries whom it is empowered to employ. The board may always engage legal counsel for investment, federal, and tax matters and, with the approval of the attorney general, may engage counsel for all other matters.

*Day,* 635 A.2d at 496–97 (citations omitted). The court further emphasized that because the retirement system is a contributory one, the impact of disbursements may be felt by all participating employers and employees, so that even if the State's interests were well represented in the workers' compensation proceedings, "the same cannot be said of the interests of the members of the retirement system, nor of the many contributing employers other than the State." *Id.* at 497.

Similarly in *Traub v. Board of Retirement of the Los Angeles County Employees Retirement Association,* 34 Cal.3d 793, 195 Cal.Rptr. 681, 670 P.2d 335 (1983), a probation officer employed by Los Angeles County sought a service-connected disability pension, claiming psychiatric disability. The Retirement Board determined that the probation officer was disabled, but granted only the lesser retirement allowance for "disability that is not service-connected," and a referee affirmed the Board's decision. *Id.,* 195 Cal.Rptr. 681, 670 P.2d at 337. Thereafter, the probation officer sought judicial review in the trial court, which also affirmed the Board's decision, reasoning that the officer's "psychiatric condition" arose out of his wrongful termination, "not from the job activities." *Id.* On appeal, the probation officer argued that "the required connection between disability and employment was conclusively established, under res judicata principles, by a decision of the Workers' Compensation Appeals Board," which awarded

him benefits for "injury to his emotional state." *Id.* The Supreme Court of California rejected that argument, because "the requisite privity between the county, against which the award was made, and the county Retirement Board, appear[ed] to be lacking." *Id.*, 195 Cal.Rptr. 681, 670 P.2d at 338. The court reasoned that a Retirement Board does not act as an agent for the county, but as administrator of the county retirement system, "an independent entity established pursuant to [county law]." *Id.* The court also emphasized that funding for the system comes from both governmental employers and from employees, so that any adjudication of a claim for benefits "may have economic impact upon the membership of the association," as well as upon the county. *Id.*

▮ As in *Day* and *Traub,* the Board in the present case recognized that the System and the State are distinct entities, so that the State's General Fund is not just a pot in which the System may dip:

> MSRPS funds are unique in several ways. All of the State's retirement and pension system funds are assets held in trust as governmental plans under the Internal Revenue Code (IRC) 26 U.S.C. §§ 401(a) and 414(d), which confer tax benefits under IRC § § 414(h)(2) and 501(a) to such qualifying funds held not on behalf of the State but instead, on behalf of the participating members and their beneficiaries. MSRPS funds are held not for public use as other special funds are held to be used to build or acquire such public amenities as roads or newly purchased park property, for example. MSRPS holds its funds strictly in a fiduciary capacity to be paid to private individuals for use as they please, upon the occurrence of a certain future condition, namely employee retirement, presumably as set forth in current law and employment contract provisions establishing binding contractual obligations. Legislative encumbrance of vested retirement benefits or those promised to become vested at a future time certain, could well be subject to effective court challenge and reversed as retroactive impairment of contract. This Board does not reach such a conclusion today, but only notes that assets held by MSRPS

are not assets of the State in the ordinary meaning of State assets. Instead, they are uniquely held by MSRPS in fiduciary trust on behalf of others.

Thus, we agree with the Board that the State and the System are distinct entities for the purpose of calculating damages as both lost contributions and lost interest on those contributions due the System as a result of Milliman's contractual breaches.[11]

 Finally, Milliman argues that the System was contributorily negligent in providing a "confusing" definition of the "00" code. Initially, Milliman asserts that the Board's finding that the System accurately reflected "the meaning of its codes as a part of its data dictionary" was not supported by substantial evidence. The System presented testimony by Brent Mowery, a pension actuary employed by the Hay Group, regarding Milliman's obligation to carefully review the System's data and correct any misunderstandings:

[Mr. Mowery]: I'd like to share something that I think is relevant from my early days as an actuarial student back in the time frame of 1975 to 1982.

I remember guidance from the senior actuaries that I worked for saying we can't let the client fool us with respect to their data. We need to be able to detect if there's a problem with their data, but we don't have time to go through and read every record for the 10,000 lives that they've submitted. Your challenge, Mowery, is to figure out if this data makes sense. Can we buy it and run with it 'cause we're going to waste a whole lot of time if there's a problem.

---

11. In a related argument, Milliman refers us to *Amwest Savings Ass'n v. Statewide Capital, Inc.*, 144 F.3d 885 (5th Cir.1998) and *United States v. City of Twin Falls, Idaho*, 806 F.2d 862 (9th Cir.1986), as support for the proposition that an award of damages to the System would amount to a windfall, because "[t]he State has, and will continue to make, all payments to the System" to compensate for the coding errors. This argument is based upon an assumption that the State is presently obligated to compensate the affected systems for losses sustained as a result of Milliman's actuarial errors, which we will not consider because the State is not a party before us.

So I just share that because, you know, reliance on the client to give clean data—and it was a struggle, a balancing act, because clients wanted inexpensive valuations. They wanted you to take their data and run with it. No questions asked. That was the way to get the cheapest valuation. That's a dangerous thing for an actuary to do.

\* \* \*

[Counsel]: You were aware that Milliman in this appeal says that it failed to value these liabilities because it misunderstood the Agency's coding systems. Are you aware of that?

[Mr. Mowery]: Yes, I am.

[Counsel]: And in your opinion, does any misunderstanding on Milliman's part of the Agency's coding system excuse it's failure to meet this professional responsibility?

[Mr. Mowery]: No, it does not.

[Counsel]: And why is that?

[Mr. Mowery]: That's an aspect of an actuarial valuation that a pension actuary needs to get right, cannot be misled. It's too important. And in my experience and what I believe reasonable actuaries in 1982 would say is by all means, you've got to properly capture the normal form of payment applicable to a pension system in performing your valuation, and you can't be misled. You've got to overcome any kind of temptations to be taken down the wrong path and get it right.

[Counsel]: If the actuary is confused about data relating to the normal form of payment, in your view, what would be expected of a reasonable professional actuary in that circumstance?

[Mr. Mowery]: To seek the truth and make sure you're confident that you found it. And, you know, actuaries have alternatives as to how they get to the facts. Probably the most reliable way is to go to the legal plan document or legal section of the Code that would spell this out. Seek something that is, you know, in writing and can't be misinterpreted.

Alternative ways to seek this information would be talk to the client, try to get clarification directly from your client. An alternative in this instance would have been for the Milliman actuary to talk with the [previous actuary] who handled the valuation in the preceding year and see what the [previous actuary] has to say. But there are multiple ways to get to the determination of the normal form of payment that applies and a way has to be found to get to the correct answer.

Milliman also offered evidence regarding its allegation that the System was contributorily negligent, in the form of testimony by Dr. Thomas Delutis, a consultant in the area of "business process improvement" and "computing solutions," as follows:

[Counsel]: Have you concluded to a reasonable degree of professional certainty—have you reached a conclusion to a reasonable degree of professional certainty as to whether the Agency exercised reasonable care in documenting and communicating the meaning of the 00 code?

[Dr. Delutis]: Yes.

[Counsel]: And what is your opinion?

[Dr. Delutis]: That they did not.

* * *

[Board Member]: Dr. Delutis, what should they have done?

[Dr. Delutis]: All that this says—if you provide this information, 00 through 05, to a computer programer or to anybody else, it is 00 through 05. There is nothing that says what 00, how it ties back to the election that a retiree has. It's just 00 through 05. That's all it says. Therefore, something else, especially in programming, something else had to be known and provided to the programmer to take that code, and to do something with it.

Now, if you look at what's done here, says ah, 00 has different meanings based on which system you're in. So it means one thing for one system; something else for another system. So not only did you have to know the code value, the value that was in there, but also the system that it was being applied to. And oh, by the way, you also have to

know, for certain systems, if he's married or not, or she is married or not. So there was another set of criteria.

All that needed to be explained in some document someplace for a programmer to take that in there and, essentially, use it to calculate whatever benefit payment stream was being calculated. So somehow on the master tape, there was a program someplace that had, in addition to those values, 0006, some other additional information that it used. Remember, the program is like a beautiful child. It does exactly what you tell it to do. So somebody had to tell how to use and interpret those data values in order to come up with a payment stream. That was not sufficient. That documentation didn't do the job.

The Board credited the testimony of Mr. Mowery, an actuary versed in the pension arena, rather than that of Dr. Delutis, who was not an actuary, regarding whether the data provided by the System was sufficient. Clearly there was substantial evidence upon which the Board relied to support its finding that the System was not contributorily negligent in providing the code to Milliman, given Milliman's professional obligation to review and interpret the data.

In asserting that the System was contributorily negligent as a matter of law, Milliman principally relies upon *Wegad v. Howard Street Jewelers, Inc.*, 326 Md. 409, 605 A.2d 123 (1992), in which the jewelry store was seeking damages against an accountant for failing to detect the embezzlement of funds by a store employee. The jewelry store sought a specific jury instruction indicating that a client "can rely on the accountant's knowledge and skill" and that "[i]t is not contributory negligence for a client to follow an accountant's instructions, or rely on his advice." *Id.* at 412, 605 A.2d at 125. We disagreed and reasoned that the jewelry store owners were uniquely situated to uncover the criminal actions of their employee, such that the "jury could have found that the extent of the [owner's] reliance on [the accountant] was not reasonable." *Id.* at 422, 605 A.2d at 130.

*Wegad* is wholly distinguishable, because unlike the jewelry store owners who were uniquely situated to uncover their employee's embezzling, Milliman, rather than the System, was the entity that was in a better position to detect and correct the coding error. The Board found that Milliman should have detected the coding error when it compared its 1982 calculations with the previous year's performed by another actuary and noted that "although the number of State Police retirees increased from 288 to 339 or 341, their total retirement liability decreased from $67 million to $65 million." Similarly, as the Board noted, Milliman should have discovered the error when the actuary "performed its first valuation for DNR police, a system established July 1, 1990, but instead, Milliman merely duplicated its earlier coding error." Unlike the jewelry store owners in Wegad, Milliman had a professional obligation to interpret the data provided by the System.[12]

More apt to our analysis is *Hill v. Wilson,* 134 Md.App. 472, 760 A.2d 294 (2000), in which our colleagues on the Court of Special Appeals considered whether a patient was negligent in his claim against a physician, for the physician's alleged failure to properly diagnose and treat a serious infection. The physician contended that the patient was contributory negligent, because the patient was directed to return for treatment if his condition worsened and had failed to do so. The intermediate appellate court held that the trial judge did not err in denying the physician's motion for summary judgment, because the

---

**12.** In a similar vein, Milliman refers us to *E.F. Hutton Mortgage v. Pappas,* 690 F.Supp. 1465 (D.Md.1988), in which the federal district court determined that Hutton's claim against its accounting firm was barred by contributory negligence. In that case, Hutton purchased loans originated by First American Mortgage Company and sought to recoup losses from its accounting firm, claiming that the accounting firm had failed to disclose that First American's "[s]ervicing records were in chaos." *Id.* at 1474. The court reasoned that Hutton's losses were not proximately caused by the accounting firm, because the mortgage purchaser already knew that First American's loan servicing operation was "severely deficient." *Id.* at 1475. The present case is wholly distinguishable, because as the Board opined, Milliman had numerous opportunities to detect and correct the coding error and also had a professional obligation to review and interpret the data provided by the System.

physician failed to demonstrate "some prominent and decisive act [by the patient] which directly contributed to the accident and which was of such a character as to leave no room for difference of opinion thereon by reasonable minds." *Id.* at 492, 760 A.2d at 305, quoting *Campbell v. Montgomery County Bd. of Educ.*, 73 Md.App. 54, 64, 533 A.2d 9, 14 (1987).

In the present case, although the Board noted that the System may have employed greater clarity in defining the various codes, the Board determined that the System provided ample explanation of the "00" code involving the three affected retirement systems when it provided to Milliman "its written Annual Valuation Record," as well as "employee brochures describing retirement payment provisions." To the extent that the coding may have been confusing, Milliman bore an express duty, as the Board opined, to solicit "further clarifying information until it accurately understood the information provided to it by the client."

■ Our final task is to consider the System's certiorari question, namely whether the Circuit Court erred in reducing the Board's damage award for lost contributions in the amount of $34,200,000. In an oral opinion, the Circuit Court determined that the System failed to demonstrate that the $34,200,000 in lost contributions "no longer exist[s]" so that the Legislature could not fund the losses sustained by the System as a result of Milliman's breach. Because the State was not a party to the proceeding before the Board, or for that matter, before the court, whether any damage award by Milliman should be offset by an amount retained by the State was not properly before the Circuit Court. *See Hashmi*, 416 Md. at 707, 7 A.3d at 1059. Therefore, the Circuit Court erred in reducing the Board's award of damages to the System by $34,200,000 in lost contributions. As a result, we shall vacate the judgment of the Circuit Court and direct that the Board's decision be affirmed in its entirety.

**JUDGMENT OF THE CIRCUIT COURT FOR BALTIMORE CITY VACATED, AND CASE REMANDED TO THAT COURT WITH DIRECTIONS TO AFFIRM THE**

DECISION OF THE STATE BOARD OF CONTRACT AP-
PEALS. COSTS IN THIS COURT AND IN THE CIRCUIT
COURT FOR BALTIMORE CITY TO BE PAID BY AP-
PELLANT.

HARRELL, J., dissenting, in which MURPHY and
ADKINS, JJ., join.

The Maryland Code requires the Maryland State Retire-
ment and Pension System ("the System") to employ the
services of an actuary to "give technical advice . . . on the
operation of the funds," among other duties. Maryland Code
(1993, 2009 Repl.Vol., 2010 Supp.), State Personnel and Pen-
sions Article, § 21–125(a).[1] Pursuant to the statute, each
year, the State contributes to an "accumulation fund," which
the System stewards and uses to meet obligations to employ-
ee-members. See §§ 3–501, 21–302–308. The State bases
these contributions on the actuary's estimates.

In the present case, the actuary hired by the System,
Milliman, Inc. ("Milliman"), committed a long-running mathe-
matical error that caused a contribution shortfall of $34 mil-
lion. In addition to this shortfall, the System alleges (and the
Board of Contract Appeals's and the Majority's opinions
agree) that the total damages should include an additional $39
million, representing the interest the System would have
reaped through investment of the contribution shortfall. That
total—$73 million—is not a proper or accurate calculation of
damages as a matter of law, as I see it. Although I grant that
the System is a "special" appendage of State government,
vested with a somewhat unique degree of independence, for
purposes of calculating damages here (if not more), there is no
legally- or logically-sound reason to treat the System and the
State as separate entities.

Because the System and Milliman did not specify how
damages should be calculated in the instance of a breach of

---

1. All code citations refer to the State Personnel and Pensions Article,
unless otherwise indicated.

the contract, we should put the parties in the position they would have been but for the breach. To do so, we should not blind ourselves to the reality that the State and the System are part of a single government and that, together, they did not suffer a contributory loss, as the State continued to collect and enjoy the same amount of revenue, irrespective of Milliman's error. The fact that the System was unable to invest the $34 million simply leaves open the possibility of limited damages—the difference in the rate of investment return attributable to the two governmental units. According to Milliman, that amounts to $24.7 million.

## I.

Before this Court, Milliman argues that any damages calculation should take into account that the State and the System are one entity, even though the State, as such, was not a named party to this litigation. The facts of the present case indicate that the State did not change its behavior, save for retaining the $34 million in other areas of the government and not the System. Stated another way, the State collected the same amount of revenue, but simply used the money in other contexts, outside the retirement system. Thus, Milliman posits that there must be more limited damages than was awarded by the Board of Contract Appeals.

### A. The State and the System's Ineradicable Interconnectedness

To "determin[e] whether a statutorily-established entity is an agency[,] instrumentality," or mere appendage, "of the State for a particular purpose," like the calculation of damages, we have "repeatedly recognized that there is no single test...." *A.S. Abell Pub. Co. v. Mezzanote*, 297 Md. 26, 35, 464 A.2d 1068, 1072 (1983). Instead, "[a]ll aspects of the interrelationship between the State and the statutorily-established entity must be examined in order to determine its status." *Id.* (citations omitted); *see e.g., A.S. Abell Pub. Co.*, 297 Md. at 39, 464 A.2d at 1074 ("After examining all aspects of the interrelationship between the State and [the Maryland

Insurance Guaranty Association ("MIGA") ], including the degree of control exercised by the State over MIGA's operation, we are persuaded that MIGA is an agency or instrumentality of the State [and, therefore,] within the scope of the Public Information Act.").[2]

Through Title 21 of the State Personnel and Pensions Article, the Legislature created a "State Retirement and Pension System" to "provide benefits ... for [State-employee] participants in the several systems." § 21–101(b). Although the Legislature created an uncompensated Board of Trustees to run much of the System, it retained significant managerial oversight and discretion. MARYLAND STATE RETIREMENT AND PENSION SYSTEM, COMPREHENSIVE ANNUAL FINANCIAL REPORT 24 (2010), http://www.sra.state.md.us/Agency/Downloads/CAFR/ CAFR–2010.pdf ("The System is fiscally dependent on the State by virtue of the legislative and executive controls exercised with respect to its operations, policies, and administrative budget."). Indeed, under the statute, the State is obliged to "pay[ ] ... all allowances and other benefits"; to "creat[e] and maint[ain] ... reserves in the accumulation fund[ ]"; to "credit[ ] ... regular interest to the annuity savings fund[ ]" and to "pay[all] ... expenses for *administration and operation* of the several systems." § 21–302(a)(1)–(4) (emphasis added). To that end, the Governor and the Legislature require the Board to submit an annual budget report, § 21–109, which they consult discretionarily in their preparation of the

---

**2.** Engaging this analysis, this Court should not apply, as the Majority opinion does, a deferential standard of review. The Majority opinion concedes that the relevant question here is "how to measure damages caused by errors in actuarial recommendations related to pensions systems...." Majority op. at 157, 25 A.3d at 1004. Stated another way, the issue is whether the State and the System should be considered one entity for purposes of calculating damages. This is a question of law, deserving a de novo standard of review. *See L.A. County Employees Ret. Ass'n v. Towers, Perrin, Forster & Crosby, Inc.,* 2002 WL 32919576, at *10, 2002 U.S. Dist. LEXIS 27916, at *31 (C.D.Cal.2002) ("Whether government agencies should be deemed a single entity for purposes of setoff is a question of law." (citing *United States v. Maxwell,* 157 F.3d 1099, 1102 (7th Cir.1998))).

State Budget.[3] Moreover, while the Board is empowered to hire an actuary, like Milliman, the General Assembly reserved the power to hire its own "Legislative Auditor" to "conduct an annual or biennial fiscal and compliance audit of the [System's] accounts and transactions . . . ." § 21–127.

The State's paternal role with regard to the System does not end there. The General Assembly designated the State Treasurer, not the Board of Trustees, "[a]s the custodian of . . . the accumulation, annuity savings, and expense funds of the several systems . . . and the assets of the Board of Trustees." Payments from these funds must follow regulations formulated by the Board, but approved ultimately by the State Treasurer. § 21–124(a)(2). The Legislature also entrusted the State Treasurer with the job of physically "safeguard[ing]" the System's assets. § 21–124(b). The State discloses these assets in its own financial statements. *See* COMPREHENSIVE ANNUAL FINANCIAL REPORT at 24.

Such oversight and reservation of authority is understandable, given that the General Assembly—rather than the Board of Trustees, employees, or any other group(s)—is responsible for the welfare of the System. The State pays into the System not only as an "employer," but also as the only guarantor of risk and loss. Indeed, as a last resort, the statute requires the State to "pay to the accumulation fund . . . at least an amount that when combined with the amount in the accumulation fund . . . is sufficient to provide the allowances and other benefits payable out of the fund . . . ." § 21–

---

3. For fiscal year 2012, the State passed a $14.6 billion operating budget (which refers to the General Fund as opposed to debt obligations), wherein it allocated $1.5 billion for the pension system. MARYLAND DEPARTMENT OF BUDGET AND MANAGEMENT, REFORMING MARYLAND'S PENSION SYSTEM: A PATH TO SUSTAINABILITY 3 (2011), http://www.governor. maryland.gov/documents/RetirementReform.pdf. In the last decade, with the retirement of 40,000 additional members (along with myriad other factors), the State has increased its contribution amount by 178%. *See* MARYLAND STATE RETIREMENT AND PENSION SYSTEM, COMPREHENSIVE ANNUAL FINANCIAL REPORT 101 (2010), http://www.sra.state.md.us/Agency/ Downloads/CAFR/CAFR–2010.pdf; REFORMING MARYLAND'S PENSION SYSTEM 4. Nevertheless, the State faces currently $35 billion in unfunded liabilities. REFORMING MARYLAND'S PENSION SYSTEM 2.

302(c). The System does not have a separate power to raise funds, outside of investing profitability the State's and employees' contributions. § 21–108(c).

This scheme reveals that the System is merely an extension of the State (i.e., part of a single government), not simply because it was created by the Legislature, but because of the close, ongoing, and managerial presence of the State in the activities of the System. To refer to the System at large is to refer to the State, at least for the purpose of calculating damages. *Los Angeles County Employees Retirement Association v. Towers, Perrin, Forster & Crosby*, 2002 WL 32919576, at *15, 2002 U.S. Dist. LEXIS 27916, at *50 (C.D.Ca.2002) ("[W]hile the separateness of [a retirement system] and [a c]ounty is recognized for a number of purposes, this separateness is not absolute and does not pervade every aspect of the relationship. For certain functions [including the calculation of damages], [the retirement system] and the [c]ounty should be considered the same entity.").[4]

---

**4.** Although I use the word "agency," I do not mean to invoke the relationship between a corporate parent and its legally-recognized subsidiary. I agree with the U.S. District Court for the Central District of California and the U.S. Bankruptcy Appellate Panel of the Ninth Circuit that:

"[T]he more appropriate analogy is that of separate departments within a single corporation. Just as a large corporation has different departments—marketing, sales, accounting, personnel, etc.,—with individual budgets and separate interests, so does the federal government. In both situations, each separate department must compete against the others for its share of the overall budget. Such is not necessarily the case with corporate subsidiaries, who are often expected to be self-sustaining and whose fortunes are not necessarily tied to the parent's profitability."

In the instant case, the relationship between [a county retirement system] and the [c]ounty [government] is more akin to that of separate departments within a single corporation than to the relationship between a parent-corporation and a wholly-owned subsidiary. [The retirement system] is not self-sustaining, and [its] fortunes are indisputably tied to the [c]ounty's "profitability."

*See Towers, Perrin, Forster & Crosby, Inc.*, 2002 WL 32919576, at *13, 2002 U.S. Dist. LEXIS 27916, at *31 (quoting *HAL, Inc. v. United States*, 196 B.R. 159, 165 (9th Cir. BAP 1996)); *HAL, Inc.*, 196 B.R. at 163 (finding that the organization of federal agencies supported a

## B. The Extent of the System's Damages

Any measure of damages resulting from a contractual breach must be based on the facts at hand and the realities of the parties' situations. In the present case, Milliman misstated the amount that the State should provide to the System under statutory contribution formulae. As a result, the State did not contribute an extra $34 million, spread out over twenty-two years.[5] For purposes of context, those contributions would be $1.5 million per year if spread out evenly. In response to Milliman's faulty underestimation, the State did not seem to change accordingly its revenue-collection practices. This is not surprising, considering that the State, in the same timespan, contributed many billions of dollars—$1.3 *billion* in fiscal year 2010 alone. Such a minuscule annual amount of "missing" contributions did not affect the System's target funding goal and, therefore, did not alter the State's behavior.

Although an appendage of the State, i.e., the System, did not possess for its immediate use the $34 million, the State at large did. The true impact of the calculation error was that the State, and not the System, retained and invested (or applied) the $34 million elsewhere. Thus, proper damages would be the difference in the investment return only.

The story of damages would be written differently, of course, if the error had caused the employee-members not to make $34 million worth of contributions. In that instance, no one would enjoy the use of the $34 million—that is to say, the State's financial statements would be missing $34 million. That is not the case here.

When calculating damages flowing from a contractual breach (absent a contractual agreement governing the calculation of damages in the event of breach), courts endeavor to put

---

finding of mutuality, in part, because "all federal agencies draw from or contribute to a common pool of money, the U.S. Treasury").

**5.** The System claims it would have invested the money so wisely as to reap another $39 million.

the parties in the position that they would have been but for the breach. *St. Paul at Chase Corp. v. Manufacturers Life Ins. Co.*, 262 Md. 192, 250, 278 A.2d 12, 40 (1971) ("The Court should endeavor to place the injured person, so far as possible, by monetary award, in the position he would have been if the contract had been properly performed." (internal quotation marks and citation omitted)). As this Court stated:

> The damages which a plaintiff is entitled to recover for a breach of contract should be such as may fairly and reasonably be considered as either arising naturally, i.e., according to the usual course of things, from such breach of contract itself, or such as may reasonably be supposed to have been in the contemplation of both parties at the time they made the contract as the probable result of a breach of it.

*St. Paul at Chase Corp.*, 262 Md. at 240, 278 A.2d at 35 (internal quotation marks and citation omitted). To do so, we must judge not what the non-breaching party wants to recover, but what he/she/it should recover in light of the facts at hand.

In the present case, the parties did not establish in their contract how damages would be calculated in the event of a breach. As such, we must determine how to make the non-breaching party whole, in light of what "may reasonably be supposed to have been in the contemplation of both parties at the time they made the contract. . . ." *Id.* Given that the State, as a single government, was not deprived of the use of the $34 million, the proper damages amount—i.e., the amount needed to fulfill the State's expectations—is the difference in the investment return. Such a calculation has the added benefit of approximating what the parties would have expected reasonably. Milliman was being paid $100,000 a year for its actuarial services and would not have expected reasonably to pay for damages, totaling almost $100 million, for damages not suffered actually as a result of its actions. If the State/System thought a breach should lead to a windfall, whereby the actuary would match sums already in the State coffers, then it should have specified as much in the contract; it did not.

## II. The Majority Opinion's Main Underpinnings

### A. The State Is Not a Party to the Proceeding

The Majority opinion dispatches with any consideration of the State's role by pointing out that "[t]he State . . . was not a party before us, nor before the Board [of Contract Appeals]. . . ." Majority op. at 162, 25 A.3d at 1007. The Majority finds supportive in this regard a medical malpractice case in which, according to the Majority opinion, "we precluded a physician who had been adjudicated as negligent from seeking contribution from the three alleged 'joint tortfeasors' who were not joined as parties in the original action, because the [three tortfeasors] did not have an opportunity to participate in the primary case." Majority op. at 163, 25 A.3d at 1007 (analyzing *Hashmi v. Bennett,* 416 Md. 707, 7 A.3d 1059 (2010)).

The instructive value of *Hashmi* is far from evident. Here, we confront a breach of contract, involving a government claim against a private contractor. *Hashmi* was also a medical malpractice case, involving only private and distinct (legally and biologically) parties. Moreover, in *Hashmi,* we held that a tortfeasor-physician could not seek contribution from other alleged tortfeasors primarily because the hospital release protected them. *See Hashmi,* 416 Md. at 724–25, 7 A.3d at 1069–70. We then stated in the alternative (and, thus, arguably in dicta) that a post-trial "judicial determination" of contribution would deprive the alleged tortfeasors of "notice or . . . an opportunity to defend," in violation of the Maryland Rules. *Hashmi,* 416 Md. at 725, 7 A.3d at 1070 ("Even if we were to determine that the . . . [r]elease was ambiguous, we would not countenance the separate, post-trial proceeding Dr. Hashmi proposes [of the other alleged tortfeasors]. . . ."); *Hashmi,* 416 Md. at 729, 7 A.3d at 1072 (citation omitted).

In the present case, Milliman is not trying to reduce possible damages by seeking contribution from the State as a joint tortfeasor; it is arguing that there are little to no damages in the first instance, given the fact that the non-breaching party did not suffer, in fact, an actual loss. Indeed, Milliman is asking this Court (fairly in my estimation) and the Board of

Contract Appeals not to blind itself to certain facts when determining the proper measure of damages to make a non-breaching party whole. Ordinarily, I would rebuff contentions that the State lacked notice and an opportunity to defend itself, but doing so credits *Hashmi* with an unjustifiable amount of applicability—comparing the present case to *Hashmi* is like forcing a round peg into a square hole. Rather, I will address the premise of the Majority opinion's damages calculation—that the State and the System are not part of a single entity.

## B. The State and the System Are Not One Legal Entity.

Acknowledging that "we have never had occasion to consider the identity of the System and the State," the Majority opinion considers in depth two foreign cases—*Day v. New Hampshire Retirement System*, 138 N.H. 120, 635 A.2d 493 (1993), and *Traub v. Board of Retirement of the Los Angeles County Employees Retirement Association*, 34 Cal.3d 793, 195 Cal.Rptr. 681, 670 P.2d 335 (1983). Both cases involve a government employee who was awarded, by an administrative adjudication, workers' compensation benefits and then attempted to use that decision to estop collaterally the retirement system from denying similar benefits. *Day*, 635 A.2d at 494; *Traub*, 195 Cal.Rptr. 681, 670 P.2d at 337. In each case, the respective court concluded that, *for purposes of collateral estoppel*, the workers' compensation board and the retirement system were not "in privity." *Day*, 635 A.2d at 497; *Traub*, 195 Cal.Rptr. 681, 670 P.2d at 338. They noted that any payout to the government employee would come not just from the State, but also the employees who contributed to the retirement system. *Day*, 635 A.2d at 497; 670 P.2d at 338. Those employees were not represented in the initial workers' compensation decision. *See Day*, 635 A.2d at 497.

The present case does not involve the sometimes perplexing world of collateral estoppel. Rather, we confront the issue of contractual damages flowing to the State/System (including

employees, who contributed voluntarily to a State-created and -managed fund). We need not concern ourselves with "privity"; we need only determine (as we did *supra* ) that the State and System are one entity for purposes of evaluating the true financial injury in this case. *See A.S. Abell Pub. Co.*, 297 Md. at 35, 464 A.2d at 1072. Nevertheless, even if the "oneness" of the State and System—for purposes of calculating damages—depends on a finding of privity, such evidence exists in the record. The State, System, and employees all possessed the same interest in the $34 million. The State is obliged to make up any shortfalls in the System; the System has a duty to govern toward fiscal solvency; and, the employees want to secure their retirement future.[6] In short, their interests are aligned sufficiently.

---

**6.** The Majority opinion describes the question at hand as "how to measure damages caused by errors in actuarial recommendations related to pensions systems. . . ." Majority op. at 157, 25 A.3d at 1004. It determines that we must "place the [System] in the position it would have been in but for the breach." Majority op. at 159, 25 A.3d at 1005. I agree; however, the Majority opinion strays too far from that premise.

It concludes that, despite the State Government possessing the $34 million in question, the State (through its appendage, the System) is owed another $34 million. To do so, the Majority opinion spends considerable time (as it must) arguing that the State and the System are separate legal entities. In particular, as noted *supra*, it analyzes at length *Day v. New Hampshire Retirement System*, 138 N.H. 120, 635 A.2d 493 (1993) and *Traub v. Board of Retirement of the Los Angeles County Employees Retirement Association*, 34 Cal.3d 793, 195 Cal.Rptr. 681, 670 P.2d 335 (1983). It also refers to *Dardaganis v. Grace Capital, Inc.*, 889 F.2d 1237 (2d Cir.1989) and *Board of Trustees v. Mercer*, 2003 WL 21481021, 2003 Cal.App. Unpub. LEXIS 6236 (Cal.Ct.App.2003), which I shall discuss here.

In *Dardaganis* and *Mercer*, the question decided was whether the lost use of contribution—that is, the difference in the rate of return between a government and its retirement system—was included appropriately as "damages." The *Dardaganis* court held that "[i]f, but for the breach, the [f]und would have *earned* even more than it actually earned, there is a 'loss' for which the breaching fiduciary is liable." *Dardaganis*, 889 F.2d at 1243 (emphasis added). The *Mercer* court ruled that the "use of lost *investment income* [is] a reasonable basis on which to calculate damages." *Mercer*, 2003 WL 21481021, at *5, 2003 Cal.App. Unpub. LEXIS 6236, at *14 (emphasis added). Neither court declared precedential law on the matter of contributions, despite favorable dicta in *Mercer*.

## C. Maryland Has Not Adopted the "Unitary Creditor" Doctrine.

Milliman argues that the State and the System are one legal entity and that, as a result, it "should be allowed to recoup or *offset* the benefit of the funds retained by the State against any damages claimed by the System...." (Emphasis added.) As part of this claim, Milliman refers to the federal "unitary creditor" doctrine, a principle which allows federal agencies to "set off debts owed by one agency against claims that another has against a single debtor." *Turner v. Small Bus. Admin.*, 84 F.3d 1294, 1296 (10th Cir.1996) (en banc). A classic illustration is where Agency 1 owes money to a person, but that person owes money simultaneously to Agency 2. The agencies and individual debtor are permitted to setoff those claims.

Transposed to the present context, such a claim fits awkwardly, as we are not dealing with a company that simply owes money to the government, whether we define that government as the State or the System. I believe that the "setoff" claim may be better understood under ordinary contract law and damages canons, as explained *supra*. Nonetheless, the argument may be made that, should the System receive a judgment for all contributions and investment interest, Milliman would be able to assert a claim against the State. Thus, Milliman should be able to skip a step and simply have its own claim heard in the same action.

Indeed, in a case remarkably similar to the one at bar, the U.S. District Court for the Central District of California allowed an actuary who committed mathematical errors, which caused a county government to underpay its retirement system, to argue for such a setoff. *Towers, Perrin, Forster & Crosby*, 2002 WL 32919576, at *9, 2002 U.S. Dist. LEXIS 27916, at *29. The actuary, in particular, claimed that:

> [A]ny recovery by [the retirement system] must be reduced based on the amounts that allegedly should have been contributed by the [c]ounty but were not, because [the retirement system] and the [c]ounty are effectively a "closed

system." [The actuary] contends that it is ... entitled to offset ... any funds, including any earnings on such funds, the [c]ounty did not contribute ... and thus retained for other uses....

*Towers, Perrin, Forster & Crosby,* 2002 WL 32919576, at *1, 2002 U.S. Dist. LEXIS 27916, at *3. "Even in the absence of the precise articulation of the claim to be setoff against [the one at hand]," the court held that a setoff defense is appropriate in light of the ultimate goal of "eliminat[ing] a superfluous exchange of money between the parties...." *Id.* (internal quotation marks omitted).

To so conclude, the court needed to find sufficient mutuality between the actuary and the government—enter the unitary creditor doctrine. This reliance, the Majority opinion concludes, renders the decision wholly-inapplicable to the present case, as "we have not ascribed" to that doctrine. Majority op. at 163, 25 A.3d at 1008 n. 10. I disagree respectfully.

In *Lomax v. Comptroller of Treasury,* 323 Md. 419, 420, 593 A.2d 1099, 1100 (1991), we considered a case where a state school teacher, Mary Lomax, received retirement benefits from the System. The Comptroller of the Treasury ("Comptroller") obtained a judgment and lien against Lomax for unpaid income tax. *Id.* "In an attempt to satisfy this judgment against Lomax, the Comptroller filed with the Clerk of the Circuit Court for Baltimore County a request for writ of garnishment to be served on the ... System[ ]...." *Id.* We held that the State could effectuate such an inter-governmental maneuver, explaining that:

In the instant case, the Retirement System and the Comptroller are both agencies under the control of the same sovereign, the State. Maryland Code (1957, 1988 Repl.Vol., 1990 Cum.Supp.), Art. 73B, § 16 provides that payment of all pensions, as well as all expenses for the administration and operation of the state retirement systems are obligations of the State. The [administrative] inconveniences enumerated in *City of Baltimore* [*v. Comptroller,* 292 Md. 293, 439 A.2d 1095 (1982) ] and *Hughes* [*v. Svboda,* 168 Md.

440, 178 A. 108 (1935), dealing with a local government paying benefits to the State rather than local-government employees] clearly do not apply here since the Comptroller and the Retirement System work within the same governmental unit and both are even represented by the same attorney, the Attorney General. The public affairs of the State government would in no way be disrupted if these two agencies of the same government were permitted to cooperate in the garnishment of Lomax's pension benefits. *City of Baltimore* is clearly inapposite.

It is a fundamental principle of creditors' rights that creditors have a right to *set-off* and may apply moneys owed to debts due. See *United States v. Munsey Trust Co.*, 332 U.S. 234, 67 S.Ct. 1599, 91 L.Ed. 2022 (1947): "The government has the same right 'which belongs to every creditor, to apply the unappropriated moneys of his debtor, in his hands, in extinguishment of the debts due to him.'" *Id.* at 239, 67 S.Ct. at 1602, 91 L.Ed. at 2027 (quoting *Gratiot v. United States*, 40 U.S. (15 Peters) 336, 370, 10 L.Ed. 759, 771 (1841)). We doubt that the Legislature intended to extinguish the State's right to accomplish through the legal process of garnishment that which it might be entitled to do by a self-help mechanism such as set-off.

*Lomax*, 323 Md. at 426–27, 593 A.2d 1099 (emphasis added).

This is the most classic form of the unitary creditor doctrine, where one agency (i.e., the System) owes money to a debtor, but that debtor owes money to another agency (i.e., the Comptroller). Indeed, these were similar to the facts of the case in which the U.S. Supreme Court adopted originally the unitary creditor doctrine—*Cherry Cotton Mills v. United States*, 327 U.S. 536, 105 Ct.Cl. 824, 66 S.Ct. 729, 90 L.Ed. 835 (1946). *See Turner*, 84 F.3d at 1296–97 ("[T]he Court's language [in *Cherry Cotton Mills* ] clearly indicates that agencies of the United States government are deemed a unitary creditor...."); *Turner*, 84 F.3d at 1296 ("[I]n *Cherry Cotton Mills* ... the Supreme Court made clear that the United States has a right to effect interagency setoffs."). As a further indication that this Court adopted the unitary creditor concept in *Lo-*

*max,* we quoted there *Munsey Trust Co.,* a case which relies explicitly on *Cherry Cotton Mills* to conclude that an agency need not pay a contractor who owed a greater sum of money to another agency. *See Munsey Trust Co.,* 332 U.S. at 240, 67 S.Ct. at 1602, 91 L.Ed. at 2028.[7, 8, 9]

---

**7.** The Majority opinion disagrees with the notion that, in *Lomax v. Comptroller of Treasury,* 323 Md. 419, 420, 593 A.2d 1099, 1100 (1991), this Court adopted substantively the unitary creditor doctrine, arguing that "[w]here the unitary creditor doctrine has been embraced, it has been in explicit terms: '[T]he United States is treated as a *unitary creditor,* and agencies of the Untied States government ... may set off debts owed by one agency against claims that another agency has against a single debtor." Majority op. at 164, 25 A.3d at 1008 n. 10 (emphasis added) (quoting *Turner v. Small Bus. Admin.,* 84 F.3d 1294, 1296 (10th Cir.1996) (en banc)). The case on which the Majority opinion relies, *Turner,* acknowledges that the Supreme Court adopted the unitary creditor doctrine in *Cherry Cotton Mills v. United States,* 327 U.S. 536, 66 S.Ct. 729, 90 L.Ed. 835 (1946). *See Turner,* 84 F.3d at 1296–97 ("[T]he Court's language [in *Cherry Cotton Mills* ] clearly indicates that agencies of the United States government are deemed a unitary creditor . . . ."); *see also Hi. Airlines, Inc. v. United States,* 122 F.3d 851, 852–853 (9th Cir.1997) ("The Supreme Court clearly adopted the unitary setoff rule for government agencies in the nonbankruptcy context in *Cherry Cotton Mills* . . . ."); *In re Nuclear Imaging Sys. Inc.,* 260 B.R. 724, 733 (Bankr.E.D.Pa.2000) ("The decision most often cited in support of the 'unitary creditor' principle is *Cherry Cotton Mills* . . . ."). The Supreme Court adopted this doctrine in *Cherry Cotton Mills* despite never using the talismanic words "unitary" or "creditor." *See generally Cherry Cotton Mills,* 327 U.S. at 536, 66 S.Ct. at 729, 90 L.Ed. at 835.

**8.** The Majority opinion concludes that the System is entitled to damages, "no matter whether the fund's assets grew as a whole . . . ." Majority op. at 159, 25 A.3d at 1005. I disagree. According to the record, one Milliman error caused underpayment to the System. Another, unrelated Milliman error, however, caused the System to take in more money than required actually. In particular, Milliman overestimated the amount required to meet the Cost of Living Adjustment ("COLA"), resulting in a $160 million addition to the three retirement plans at bar. This is twice the amount the System seeks in damages. Had Milliman presented more evidence before the Board of Contract Appeals of the overfunding issue, I would be more inclined to tether my dissent to these grounds.

**9.** Milliman also argues that there are no damages because the State is obliged to pay any liabilities in the System. The Board of Contract Appeals rejected this averment because to do otherwise would leave the State or System without any effective recourse against a breaching

### III.

My reservation with the Majority opinion stems from its disregard of otherwise accessible and dispositive contract axioms, the polestars of the damages question. When a party claims a loss, it must demonstrate the reality of that loss—the State asks for another $34 million, despite previously collecting and enjoying the same. Moreover, I fail to see how the set-off and unitary creditor principles—if necessary to bring into focus the full damages issue—are not applicable to the present case. I harbor also some hesitation regarding our eagerness to declare agencies, especially those that depend on State Government funds, as separate and unique entities, approximating corporate subsidiaries. *But see Maryland Transportation Authority v. Maryland Transportation Authority Police Lodge # 34 of the Fraternal Order of Police,* 420 Md. 141, 21 A.3d 1098 (2011) (holding that the Maryland Transportation Authority did not have total autonomy such that it could bargain collectively, even though the Legislature delegated to it a great deal of authority, including the ability to raise revenues through tolls).

In my opinion, we should direct a remand to the Board of Contract Appeals with instructions to recalculate damages to reflect the fact that the State and the System are a single entity. Practically speaking, the Board of Contract Appeals should determine and then limit damages to the difference between what the State earned, in fact, and what the System would have earned, with respect to a return on investment of the $34 million in "missing" contributions.

---

actuary. Like the Board of Contract Appeals, I do not find Milliman's claim particularly persuasive, but I will comment briefly.

As explained in this dissent, an actuary faces monetary consequences if it breaches the contract—the amount of *actual* loss suffered by the State. If Milliman did not inflict any damages *in fact,* then, like any other breaching party, it should not be required to provide recompense at law. If the State is not satisfied with this result, it could have—and, in my opinion, should have—detailed in the contract how damages would be calculated.

Judge Murphy and Judge Adkins authorize me to state that they join the views expressed in this dissenting opinion, except that Judge Adkins does not subscribe to footnote 8.