**PUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

**No. 18-1106**

BRANDON BERKENFELD; BARBARA HOLLAND-EYTAN; SANDRA RICKIE DIAMOND,

      Plaintiffs - Appellants,

v.

GARY R. LENET; MORGAN STANLEY & CO. LLC, a/k/a Morgan Stanley Smith Barney LLC,

      Defendants - Appellees.

Appeal from the United States District Court for the District of Maryland, at Baltimore. Paula Xinis, District Judge.  (1:16-cv-01227-PX)

Argued:  December 12, 2018                Decided:  April 8, 2019

Before GREGORY, Chief Judge, WYNN and THACKER, Circuit Judges.

Reversed and remanded by published opinion.  Judge Wynn wrote the opinion, in which Chief Judge Gregory and Judge Thacker joined.

David E. Fink, LAW OFFICES OF DAVID E. FINK, Baltimore, Maryland, for Appellants.  Gilbert William Boyce, KUTAK ROCK, LLP, Washington, D.C., for Appellees.

WYNN, Circuit Judge:

Plaintiffs Brandon Berkenfeld, Sandra Ricki Diamond, and Barbara Holland-Eytan allege that negligent advice from Defendants—their financial advisor, Gary Lenet, and his employer, Morgan Stanley & Co., LLC—resulted in less favorable tax distribution options on their annuities inherited from the estate of Claire Blumberg. The district court found that Plaintiffs were barred from recovery under Maryland's contributory negligence law. But Maryland has a high bar for taking questions of contributory negligence from a factfinder and Plaintiffs' evidence offers a basis for a reasonable factfinder to determine that they justifiably relied on Defendants' advice. Accordingly, we reverse the district court's grant of summary judgment in favor of Defendants.

I.

A.

Lenet is a financial advisor and Senior Vice President at Morgan Stanley. Morgan Stanley—on its website—and Lenet—through his LinkedIn webpage—represent that Lenet specializes in "estate and trust planning" and was recognized in 2009 as "one of the Top 1,000 Financial Advisors in the country, one of only twenty advisors chosen in the state of Maryland." J.A. 658, 660. Morgan Stanley and Lenet also represent that Lenet has taught "continuing education requirement courses to external CPAs and Insurance Agents." J.A. 658, 660.

Lenet served as Blumberg's financial advisor for several years and continued to do so after Blumberg granted Diamond the Power of Attorney over her financial affairs in November 2012. In that capacity—and as Blumberg's successor trustee—Diamond

2

stated that she communicated with Lenet "almost daily either by e-mail or telephone regarding various financial issues." J.A. 641.

Lenet also had an independent "professional and personal" relationship with each Plaintiff. Thus, as to Diamond, Lenet provided personal finance advice including, for instance, advising her on how much to spend in securing a mortgage for her home and helping her to secure a mortgage. Because of her "almost daily" communications with Lenet, Diamond "believed that [Lenet]'s financial advice was reliable." *Id.* As to Holland-Eytan, Lenet met with her in person and over the phone "periodically for several years to discuss [her] investments, [her] future in those investments, and how they would support [her at] retirement." J.A. 644. "Over time, [Holland-Eytan] became comfortable relying on the financial opinions of [Lenet]," particularly because of the "care and service he provided to [Blumberg]." *Id.* And as to Berkenfeld, Lenet and Berkenfeld exchanged "regular e-mails, occasional phone calls, and face-to-face meetings several times a year." J.A. 643. On occasion, Lenet provided Berkenfeld with stock tips. Berkenfeld stated that he "felt comfortable relying on . . . Lenet's advice and opinions regarding financial matters because he seemed very knowledgeable and had a great company like Morgan Stanley behind him." *Id.*

### B.

The annuities at issue in this case were issued by Lincoln Financial and Commonwealth/Scudder to Blumberg. Blumberg designated Plaintiffs, who were her relatives, as equal beneficiaries of the two annuities.

3

Soon after Blumberg's passing in late February 2014, Lenet visited Plaintiffs to discuss the annuities. According to each Plaintiff, Lenet advised them that the only way for them to receive their share of the annuities was through a single lump-sum payment. That advice was consistent with advice Diamond received from Lenet on two prior occasions. Plaintiffs did not pursue or receive any other advice regarding distribution options, stating that they trusted and relied on Lenet's assertion that a single lump-sum distribution was the only option available.

In accordance with Lenet's advice, Plaintiffs completed an election form to receive their lump-sum distribution. In addition to the lump-sum option that Plaintiffs selected, the election form identified seven other "Payment Options." Immediately preceding the "Payment Options" section, the form stated that the annuity provider "is available to address any questions you may have." J.A. 533. A separate "Tax Withholding Section" of the election form stated: "You may wish to discuss your withholding election with a qualified tax advisor." J.A. 537. Berkenfeld testified that he did not read the election form, and Holland-Eytan testified that she could not recall whether she read the form. Holland-Eytan stated that, after she signed the election form, she twice asked Lenet if other distribution options were available, and on each occasion "Lenet stated that there were no other available disbursement options." J.A. 644.

The record includes conflicting materials as to whether Lenet advised Plaintiffs to consult with a tax advisor before making a distribution decision. Plaintiffs' original complaint filed in state court alleged that, "Morgan Stanley advised Plaintiffs that they may wish to seek tax advice." J.A. 13. In tension with that allegation, Berkenfeld

4

testified in his deposition that Lenet did not tell him to seek independent tax advice. And in an affidavit, Holland-Eytan appears to similarly assert that Lenet never advised her to seek independent tax advice. J.A. 644 ("I trusted [Lenet] as my financial professional and *unless he specifically said I should talk to my CPA regarding the tax consequences of making different decisions*, it is unlikely I would have done so." (emphasis added)).

Defendants' answer *denied* Plaintiffs' allegation that "Morgan Stanley advised Plaintiffs that they may wish to seek tax advice." But in tension with Defendants' denial in their answer, Lenet stated that he "expressly instructed [Plaintiffs] to consult with their tax advisors before selecting a distribution option." J.A. 622.

In sum, *both* parties' *evidence* conflicted with their *pleadings* on the issue of whether Plaintiffs were told to seek tax advice. Regardless, in accordance with Lenet's alleged advice, each Plaintiff checked boxes on the election form to receive their share of the annuities in a single lump-sum distribution and to not have federal income tax withheld from his or her distribution. According to Holland-Eytan, Lenet told her "which box to check and gave [her] the papers to sign." J.A. 644

On June 18, 2015—over a year after electing the lump-sum distribution option— Berkenfeld sent Lenet an email stating that he had spoken to an accountant who said Berkenfeld "could have saved almost $100k (in taxes) if we had taken it over [a] long time or left it in there if needed until I needed it." J.A. 646. Berkenfeld asked Lenet: "Did I have an option not to take all of [Blumberg's] money at once? And if I did why did we?" *Id.* Lenet replied:

5

If any of the monies would have been in an IRA then yes we could have deferred over 5 years. All of the annuities were owned by her personally (non-qualified) and we couldn't d[e]fer over a five year period. In the past annuities could [have] passed without taxes but that provision was changed over ten years ago. My understanding is all individual annuities expire when the owner passes away.

*Id.* Lenet's message also advised Berkenfeld that Lenet had "found a stock you may like the story, SPNC." *Id.*

Before making the election, Plaintiffs had worked with other individuals who provided financial or tax advice. Plaintiffs, however, did not contact either the annuity issuers or any financial or tax advisor other than Lenet before electing to receive the proceeds of the annuities through a lump-sum distribution. At the time of the election, Diamond and Holland-Eytan also owned other annuities, though there is no information in the record as to whether Diamond or Holland-Eytan ever had taken a distribution of the proceeds of those annuities.

C.

On April 25, 2016, Plaintiffs sued Defendants in Maryland state court, alleging negligence, breach of fiduciary duty, and professional negligence. Thereafter, Morgan Stanley removed the action to federal court and unsuccessfully moved to dismiss Plaintiffs' claims under Federal Rule of Civil Procedure 12(b)(6).

Following discovery, Defendants moved for summary judgment. In an order and accompanying memorandum entered January 4, 2018, the district court granted Defendants' motion. First, the district court concluded that the facts adduced by Plaintiffs in discovery supported a prima facie case of negligence. *Berkenfeld v. Lenet*,

6

No. CV PX-16-1227, 2018 WL 287672, at *3–5 (D. Md. Jan. 4, 2018). In particular, the court concluded Lenet owed Plaintiffs an ordinary duty of care and a professional duty of care as their financial advisor and therefore was obliged "to exercise the skill and knowledge normally possessed by members of [his] profession or trade." *Id.* at *3 (alterations in original) (quoting *Walpert, Smullian & Blumenthal, P.A. v. Katz*, 361 Md. 645, 693 (2000)). The court next concluded that Plaintiffs created a triable issue of fact as to whether Lenet breached that duty, based on Plaintiffs' testimony that Lenet erroneously advised them that a lump-sum payment was the only available distribution option, as well as Lenet's subsequent email to Berkenfeld, which, the court recognized, suggested that Lenet, in fact, advised Plaintiffs that a lump-sum payment was the only option available. *Id.* at *4. That breach caused Plaintiffs' undisputed damages because it was foreseeable that Plaintiffs' would rely on Lenet's allegedly errant distribution advice. *Id.* at *4–5.

Nevertheless, the district court awarded summary judgment to Defendants on grounds that Plaintiffs were contributorily negligent as a matter of law, which, under Maryland law, is a complete bar to recovery. *Id.* at *5 (citing *Union Mem'l Hosp. v. Dorsey*, 724 A.2d 1272, 1275–76 (Md. App. 1999)). In reaching that conclusion, the district court emphasized that "two Plaintiffs had years of prior experience with annuities"; Plaintiffs failed to heed Lenet's allegedly undisputed suggestion that they obtain independent tax advice; and "the election forms which Plaintiffs used to select a lump-sum distribution clearly identify . . . other distribution alternatives." *Id.* at *5–6. Plaintiffs timely appealed.

7

II.

On appeal, Plaintiffs solely contend that the district court erred by awarding Defendants summary judgment based on Plaintiffs' alleged contributory negligence. Under Rule 56(a), "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "We review a district court's grant of summary judgment de novo." *Lee v. Town of Seabord*, 863 F.3d 323, 327 (4th Cir. 2017) (citation omitted).

Under Maryland law, which the parties agree applies in this diversity action, "[c]ontributory negligence is the neglect of the duty imposed upon all individuals to observe ordinary care for their own safety. It is the doing of something that a person of ordinary prudence would not do, or the failure to do something that a person of ordinary prudence would do, under the circumstances." *Baltimore Gas & Elec. Co. v. Flippo*, 705 A.2d 1144, 1155 (Md. 1998) (alterations omitted) (quoting *Campfield v. Crowther*, 249 A.2d 168, 172 (Md. 1969)). If proven, Plaintiffs' contributory negligence operates as a complete bar to recovery. *See Union Mem'l Hosp.*, 724 A.2d at 1275.

Maryland courts have recognized that the doctrine of contributory negligence provides "harsh justice to those who may have acted negligently, in minor ways, to contribute to their injuries, and absolve those defendants from liability who can find any minor negligence in the plaintiffs' behavior." *Coleman v. Soccer Ass'n of Columbia*, 69 A.3d 1149, 1156 (Md. 2013); *see also Pope & Talbot, Inc. v. Hawn*, 346 U.S. 406, 409 (1953) (noting that contributory negligence "automatically destroys all claims of injured

8

persons who have contributed to their injuries in any degree, however slight"). Thus, the jurisdictions[*] that continue to apply contributory negligence employ several doctrines "designed to mitigate [its] harsh results." *Coleman*, 69 A.3d at 1182 (Harrell, J., dissenting) (describing mitigating doctrines); *see also, e.g.*, W. Page Keeton et al., *Prosser and Keeton on the Law of Torts* § 66, at 463–64 (5th ed. 1984) ("No very satisfactory reason for the [last clear chance] rule [has] ever has been suggested . . . The real explanation would seem to be a fundamental dislike for the harshness of the contributory negligence defense.").

Of particular relevance, Maryland courts have attempted to mitigate contributory negligence's "harsh justice" by "adopt[ing] a very restrictive rule about taking cases from the jury in negligence actions." *Hill v. Wilson*, 760 A.2d 294, 305 (Md. App. 2000) (cited favorably in *Milliman, Inc. v. Md. State Retirement & Pension Sys.*, 25 A.3d 988, 1013 (Md. 2011)) (citation omitted). Thus, "the issue of contributory negligence is a question for the jury where there is a conflict of evidence as to material facts relied on to establish contributory negligence, or more than one inference may be reasonably drawn therefrom." *Baltimore Gas*, 705 A.2d at 1155 (citation and alterations omitted). To establish contributory negligence as a matter of law—and thus remove the issue of

---

[*] "Only four states—Alabama, Maryland, North Carolina, and Virginia—and the District of Columbia continue to apply contributory negligence in its traditional guise." *Coleman*, 69 A.3d at 1160 (Md. 2013) (Harrell, J., dissenting). Additionally, "virtually every common law and civil law country, including England, has abandoned the doctrine of contributory negligence in favor of the doctrine of comparative negligence." *Harrison v. Montgomery Cty. Bd. of Educ.*, 456 A.2d 894, 906 (Md. 1983) (Davidson, J., dissenting).

contributory negligence from the province of the factfinder—"the evidence *must* show some prominent and decisive act which directly contributed to the accident and which was of such a character as to leave *no room for difference of opinion* thereon by reasonable minds." *Id.* (emphases added) (citation omitted).

Maryland courts have underscored the difficulty of demonstrating that there is "no room for difference of opinion" as to a plaintiff's contributory negligence such that a defendant is entitled to summary judgment. In determining whether there is "room for a difference of opinion," courts must "give due consideration not only to all inferences of fact tending to support the opposite view [that the plaintiff was not contributorily negligent], but also to the important presumption that the plaintiff exercised ordinary care for his [own] safety." *Hill*, 760 A.2d at 305 (alterations omitted) (quoting *Saponari v. CSX Transp., Inc.*, 727 A.2d 396, 402 (Md. App. 1999) (citing *Pachmayr v. Baltimore & Ohio R.R. Co.*, 145 A. 611, 613–14 (Md. 1929))). Maryland courts further emphasize that "even if the act done . . . turns out to be an error of judgment, this alone does not make the act negligent if an ordinarily prudent person may have made the same error." *Id.* (quoting *Faith v. Keefer*, 736 A.2d 422, 444 (Md. App. 1999)). Accordingly, this Court must apply this high bar to determine whether there was "no room for difference of opinion" as to whether Plaintiffs were contributorily negligent in electing to rely on Lenet's advice and receive the proceeds of the annuity in a single lump-sum distribution—the question to which we now turn.

In *Wegad v. Howard Street Jewelers, Inc.*, the Maryland Court of Appeals addressed under what circumstances a plaintiff can be found contributorily negligent for

10

relying on the (allegedly errant) advice or services of a professional. *See* 605 A.2d 123 (Md. 1992). In that case, a plaintiff-jeweler sued a defendant-accountant for "his failure to detect that the jewelry store's cashier was embezzling funds." *Id.* at 125. Below, the trial court had denied the jeweler's request to provide the following contributory negligence instruction:

> The client can rely on the accountant's knowledge and skill. It is not contributory negligence for a client to follow an accountant's instructions, or rely on his advice, or to fail to consult with another accountant or to discover the source of a financial problem itself where the client has no reason to suspect his accountant's advice and instructions are wrong.

*Id.* at 125. The Court of Appeals held that the trial court did not err in refusing to provide the jeweler's requested instruction. According to the court, the proposed instruction "might be read to allow a client to rely on an accountant's advice and disregard any responsibility to use reasonable measures for self-protection." *Id.* at 129. A "client, however, should not be permitted an absolute and unqualified right to rely on the accountant's advice and thereby be completely insulated from responsibility for his or her own shortcomings." *Id.* at 128.

The Court of Appeals further held that, in a professional negligence case, "a proper jury instruction should explain that a client's *reasonable* or *justifiable* reliance on his or her accountant satisfies its obligation to exercise reasonable care in safeguarding its interests." *Id.* (emphases in original). Reliance on professional advice "can be said to have been 'reasonable' or 'justified' only if a person acting with reasonable prudence and caution would have relied on the representations and would have done no more to protect [himself or her]self." *Id.* Examples of factors bearing on the reasonableness of a

11

plaintiff's reliance on professional advice include: (1) "[t]he scope of the [professional's] undertaking"—i.e., whether the professional was engaged to advise the client regarding the risk at issue; (2) "[t]he disparity of knowledge and skill as possessed by a layperson and a[ professional]" as to the matter in question; and (3) whether the client or the professional was in a better position to identify and appreciate the risk. *Id.* at 128–29.

Applying those factors to the case before it, the Court of Appeals found that there was an adequate factual basis for a jury to find that the jeweler was contributorily negligent. The court noted that the accountant advised the jeweler of cash shortages and the possibility that someone was stealing, but that the jeweler nevertheless "did nothing to monitor [the cashier's] activity in the store." *Id.* at 130. And the court further emphasized that the jeweler supervised the cashier on a day-to-day basis and therefore was in at least as good a position as the accountant to identify the cashier's theft. *Id.*; *see also Milliman*, 25 A.3d at 1013 (noting that, in *Wegad*, "the jewelry store owners were uniquely situated to uncover their employee's embezzling").

Unlike the present case, in which we must determine whether the district court properly awarded *summary judgment*, *Wegad* analyzed the question of contributory negligence in a professional negligence case *after trial*. Applying the review standard applicable at summary judgment, we must determine whether there was "no room for difference of opinion," *Hill*, 760 A.2d at 305, as to whether a "person acting with reasonable prudence and caution would have relied on [Lenet's] representations and would have done no more to protect [him or her]self." *See Wegad*, 605 A.2d at 128–29. Giving the requisite "due consideration . . . to all inferences of fact tending to support

12

the" absence of contributory negligence and applying "the important presumption that [Plaintiffs] exercised ordinary care for [their own] safety," *Hill*, 760 A.2d at 305 (citations and internal quotations omitted), we hold that there is "room for difference of opinion" as to whether Plaintiffs reasonably relied on Lenet's advice.

Construing the evidence in the light most favorable to Plaintiffs, Morgan Stanley and Lenet represented to the public, and therefore to Plaintiffs, that Lenet was a top-tier financial advisor who specializes in estate and trust planning. The record also provides a factfinder with a basis to find that Plaintiffs reasonably believed that Lenet was, or at least should have been, intimately familiar with Blumberg's estate—and the two annuities, in particular—because he had served as Blumberg's personal financial advisor for several years prior to her death and had discussed the annuities at length with Diamond. Additionally, Plaintiffs' evidence established that each Plaintiff formed an independent professional relationship with Lenet and relied upon Lenet for advice on financial matters, and that Lenet actively sought to provide such advice, perhaps to advance his professional interests.

We believe that there is "room for difference of opinion" as to whether, in such circumstances, a reasonably prudent person would rely upon Lenet's alleged advice that the only available distribution option was a single lump-sum payment. A reasonable factfinder could find that a reasonable person in Plaintiffs' position would justifiably believe that a person with Lenet's claimed experience and expertise, and familiarity with the particular financial product at issue, would know the options available for distribution of the proceeds of an annuity upon the death of the owner of the annuity. That Lenet

13

subsequently advised Berkenfeld (apparently incorrectly) as to whether other distribution options were available provides further evidence that this was the type of expertise Lenet held himself out as providing.

There also is "room for difference of opinion" as to whether a reasonable person in Plaintiffs' position would rely on Lenet's advice as to the available distribution options, without reviewing the language in the distribution or consulting with another financial advisor. *See Wegad*, 605 A.2d at 128–29 (holding that the "[t]he disparity of knowledge and skill as possessed by a layperson and a[ professional]" bears upon the reasonableness of plaintiff's reliance). A reasonable factfinder could find that Plaintiffs justifiably did not pursue other information or advice as to their distribution options because they had already obtained the advice of a professional with expertise in the area. Put simply, just as a reasonable factfinder could find that a client who has been advised by a lawyer as to a particular legal issue is not contributorily negligent by failing to seek the advice of a second lawyer or by failing to read case law himself, so too a reasonable factfinder could find that Plaintiffs acted reasonably in failing to seek a second opinion and in failing to conduct independent research as to their distribution options.

The district court nevertheless believed there was "no room for difference of opinion" as to Plaintiffs' contributory negligence because Diamond and Holland-Eytan had "years of prior experience with annuities," forms for some of which identified several distributions. *See Berkenfeld*, 2018 WL 287672, at *5. But there is no evidence that Diamond's and Holland-Eytan's years of annuity "experience" included making an election regarding the distribution of annuity proceeds—the relevant question here. And

14

a reasonable factfinder could find that a reasonable layperson might rely on a professional to understand the fine print in the annuity documentation, rather than make sense of it himself or herself.

The district court also determined that Plaintiffs were contributorily negligent as a matter of law because it is undisputed that the election forms for the Lincoln Financial and Commonwealth/Scudder annuities identified more than one distribution option and, in one section, suggested that individuals consult with a tax advisor. Given that the forms at issue were lengthy and that there is a significant "disparity of knowledge and skill" between a layperson and a financial planner, like Lenet, *Wegan*, 605 A.2d at 128–29, a factfinder could determine that Plaintiffs were not contributorily negligent in relying on Lenet's advice rather than reading the fine print of the annuity contracts and election forms. Additionally, the election forms' reference to consulting with a tax advisor appeared in the *tax withholding* section of the form, as opposed to section of the form listing *distribution options*, providing a basis for a factfinder to conclude that Plaintiffs were not contributorily negligent in not pursuing a second opinion as to their *distribution options*. That Maryland law permits a jury to find that a plaintiff was not contributorily negligent, even if the plaintiff takes an action that "turns out to be an error of judgment," *Hill*, 760 A.2d at 305, supports such a finding. Although in retrospect it may have been wise for Plaintiffs to independently review the election forms, rather than just relying on Lenet's advice, there is "room for difference of opinion" as to whether Plaintiffs' failure to do so does amounts to contributory negligence given Lenet's greater expertise in financial matters and the Plaintiffs' belief in that expertise. This precludes an award of

summary judgment. *See Milliman*, 25 A.3d at 1013 (holding the plaintiff was not contributorily negligent when the "[defendant], rather than [the plaintiff], was the entity that was in the better position to detect and correct the" error).

Finally, the district court found Plaintiffs were contributorily negligent because Plaintiffs did not consult with tax advisors before making their distribution election, "despite Lenet expressly telling Plaintiffs to obtain independent tax advice." *Berkenfeld*, 2018 WL 287672, at \*5. Setting aside the fact that *both* parties contradicted their pleadings as to whether such advice was provided, Lenet's alleged negligence is *not* that he provided errant *tax advice*. Rather, his alleged negligence is that he errantly advised Plaintiffs that there was only one *annuity distribution option*—a matter which a reasonably prudent person might believe falls within the purview of a financial advisor rather than a tax advisor. *See Wegad*, 605 A.2d at 128 (holding that the "scope of the [professional's] undertaking" bears upon the reasonableness of plaintiff's reliance). A person in Plaintiffs' position could reasonably have believed that there was no need to consult with a tax advisor regarding the tax implications of various distribution options when they had been advised by a financial advisor that only a single distribution option was available. Put differently, regardless of whether Lenet advised Plaintiffs to seek additional *tax advice*, there is "room for difference of opinion" as to whether Plaintiffs reasonably failed to do so when they were advised by a top-tier financial advisor that there was *only one distribution option* available—whatever the tax implications of that option might be. And even if a prudent person in Plaintiffs' position would have pursued expert tax advice, a reasonable person in their position may have believed Lenet could

16

provide such advice because Morgan Stanley and Lenet represented that Lenet had tax expertise, stating on their website that Lenet taught "continuing education requirement courses to external CPAs." J.A. 658, 660.

In sum, none of the considerations that the district court relied upon meet the high bar applied by Maryland courts for taking questions of contributory negligence from the factfinder. Instead, a factfinder could determine that Plaintiffs reasonably relied upon the representations of their top-tier financial accountant who managed the specific financial products in question. Although Plaintiffs' actions may amount to an "error of judgment, this alone does not make [their actions] negligent." *Hill*, 760 A.2d at 305. Accordingly, the district court erred in awarding Defendants summary judgment based on Plaintiffs' alleged contributory negligence.

### III.

Defendants contend that Plaintiffs' assumption of risk provides an alternative basis for affirming the district court's grant of summary judgment—an issue Defendants raised before the district court, but which the district court did not reach. *See Berkenfeld*, 2018 WL 287672, at *2 n.2. Because we "may affirm the dismissal by the district court on the basis of any ground supported by the record[,] even if it is not the basis relied upon by the district court," *Andrew v. Daw*, 201 F.3d 521, 526 n.3 (4th Cir. 2000), we exercise our discretion to consider whether to affirm the district court's judgment on the alternative basis of assumption of risk.

The doctrines of "[a]ssumption of the risk and contributory negligence are closely related and often overlapping defenses." *Schroyer v. McNeal*, 592 A.2d 1119, 1121 (Md.

17

1991). Assumption of risk is "grounded on the theory that a plaintiff who voluntarily consents, either expressly or impliedly, to exposure to a known risk cannot later sue for damages incurred from exposure to that risk." *Crews v. Hollenbach*, 751 A.2d 481, 488 (Md. 2000). To "establish the defense of assumption of risk, the defendant must show that the plaintiff: (1) had knowledge of the risk of the danger; (2) appreciated that risk; and (3) voluntarily confronted the risk of danger." *ADM P'ship v. Martin*, 702 A.2d 730, 734 (Md. 1997). And if proven, Plaintiffs' assumption of risk operates as a complete bar to recovery. *Id.*

The "test of whether [a] plaintiff knows of, and appreciates, the risk involved in a particular situation is an objective one." *Schroyer*, 592 A.2d at 1123. And as with contributory negligence, the "question of whether a plaintiff knew and understood the risk in a case is generally one for the trier of fact." *Crews*, 751 A.2d at 490. However, Maryland courts will find assumption of risk as a matter of law "if a person of normal intelligence, in the same position as the plaintiff, would *clearly* have comprehended the danger." *Crews*, 751 A.2d at 490 (emphasis added); *see also Schroyer*, 592 A.2d at 1123 ("[T]he doctrine of assumption of risk will not be applied unless the undisputed evidence and all permissible inferences therefrom *clearly* establish that the risk of danger was *fully* known to and *understood* by the plaintiff." (emphases in original) (citation omitted)).

To prove Plaintiffs' assumption of risk, Defendants rely upon the same factual allegations underlying Plaintiffs' purported contributory negligence. Specifically, Defendants contend that Plaintiffs had prior experience with financial instruments and signed annuity statements that listed other disbursement options and that stated "[y]ou

18

may want to discuss your [tax] withholding election with a qualified tax advisor."  J.A. 679.  But construing the evidence in the light most favorable to Plaintiffs, Plaintiffs relied upon Lenet's professional financial representations and thus believed there was "*only one option available to them*—that of a lump-sum disbursement."  J.A. 632 (emphasis added).  On these facts, it is not *clear* that person of normal intelligence would know and understand a financial danger that was specifically disclaimed by a top-tier financial advisor.  *See supra* Part II.  Whether Plaintiffs had *full* knowledge that other distribution options existed beyond the lump-sum distribution is accordingly a factual dispute for the factfinder to resolve.  *See Kahlenberg v. Goldstein*, 431 A.2d 76, 87 (Md. 1981) ("The differences in the Plaintiff's characterization" of the evidence and that of others "create[s] a factual question for the [factfinder] to resolve on the issue of the Plaintiff's assumption of the risk."); *Kasten Const. Co. v. Evans*, 273 A.2d 90, 94–95 (Md. 1971) (holding that "submission of the issue [of assumption of risk] to the jury was not error" where "the evidence is not clear and undisputed").

IV.

In sum, because there was "room for difference of opinion" as to whether Plaintiffs were contributorily negligent, the district court improperly granted Defendants' motion for summary judgment.  Therefore, we reverse the district court's judgment and remand the case for further proceedings consistent with this opinion.

*REVERSED AND REMANDED*

19